SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Michelle Lodzinski** (A-50-19) (083398)

**Argued October 27, 2020 -- Decided May 26, 2021**

**PER CURIAM**

**JUSTICE PATTERSON filed a concurrence, joined by JUSTICES FERNANDEZ-VINA and SOLOMON. JUSTICE ALBIN filed a dissent, joined by JUSTICES LaVECCHIA and PIERRE-LOUIS.**

Defendant Michelle Lodzinski appeals the Appellate Division's decision affirming her conviction of the first-degree purposeful or knowing murder of her five-year-old son. She challenges her conviction on two grounds. First, defendant contends that she was entitled to a judgment of acquittal notwithstanding the verdict under Rule 3:18-2 because the evidence presented was insufficient to support the jury's verdict that she was guilty beyond a reasonable doubt. Second, defendant argues that she is entitled to a new trial pursuant to Rule 3:20-1 because the trial court dismissed a juror who contravened its instructions by conducting independent research, and replaced that juror with an alternate instead of declaring a mistrial.

The following facts are drawn from Justice Patterson's concurring opinion.

Timothy Wiltsey (Timmy) resided with defendant, his mother, in South Amboy. A teenage neighbor, Dawn Matthews, initially babysat for Timmy. Later, following defendant's move to a different neighborhood, her niece Jennifer Blair, later Jennifer Blair-Dilcher, became Timmy's primary babysitter. When she babysat for Timmy, Blair-Dilcher was sometimes accompanied by her friend Danielle Gerding.

Shortly after Timmy's fifth birthday, defendant enrolled him in kindergarten at St. Mary's School. School records reflect that Timmy arrived late sixty-three times during his kindergarten year and was absent on twenty-five school days. The record contains no indication that defendant was ever accused of abusing Timmy prior to the murder charge against her. Several witnesses testified at trial that they viewed her to be a loving and dedicated mother to her son, and that she considered the child her first priority.

On the evening of Saturday, May 25, 1991, Blair-Dilcher and Gerding went to the carnival in Sayreville and looked for defendant and Timmy. They found defendant

1

standing alone.  Defendant said that she did not know where Timmy was and that he had been missing for fifteen minutes.

Blair-Dilcher and Gerding immediately began searching for Timmy.  Between 7:45 p.m. and 8:00 p.m., Gerding notified an auxiliary police officer, Kevin Skolnik, that her friend's son was missing.  Skolnik approached defendant and inquired about the missing child.  Defendant, who did not appear to the officer to be upset, said that "she went to get her soda, she turned her back and her son was missing."  Defendant told Skolnik that Timmy "had Ninja Turtle sneakers, he had a crew cut, [and] a t-shirt on."  Sayreville police officers and firefighters conducted an extensive search of the carnival site and the surrounding area, but failed to locate Timmy.  They searched defendant's car and found no evidence relating to Timmy's disappearance.

The following morning, defendant stated that on the afternoon of May 25, she took Timmy to a park in Holmdel and then drove Timmy to the Sayreville carnival.  She stated that they arrived at the carnival at 7:00 p.m. and that Timmy went on three rides.  Defendant told Detective Richard Sloan that a half hour after they arrived she went to get a soda, leaving Timmy "where [she] could see him," and when she turned around "he was gone."

On May 28, police searched defendant's apartment but found no evidence relevant to their search for Timmy.  In the days that followed, defendant gave police a series of inconsistent statements regarding her son's disappearance but never admitted any involvement in his disappearance.

In October 1991, a man walking near Raritan Center in Edison found a child's left sneaker with Ninja Turtle images on it, put the sneaker in a plastic bag, and delivered it to Sayreville police.  The sneaker was found approximately four-tenths of a mile from the office of defendant's former workplace.  Police later identified the sneaker as matching the serial number on the box that had contained sneakers purchased by defendant about a week before Timmy disappeared.

In March 1992, FBI Agent Ronald Butkiewicz and another FBI agent interviewed defendant with her attorney present.  The following month, Butkiewicz interviewed defendant's mother, who disclosed that defendant had previously worked at the Raritan Center.  Butkiewicz interviewed defendant again and asked her to provide a list of her employers.  Defendant listed Florida Fulfillment.  Asked where Florida Fulfillment was, defendant identified it as a "Florida-based" company.  When asked directly for Florida Fulfillment's New Jersey location, she identified the Raritan Center.

In April 1992, investigators searched a wooded area on the Raritan Center property.  On the first day of the search, a right sneaker with Ninja Turtle images on it was found.  It was later identified as the other half of the pair of sneakers purchased by

2

defendant for Timmy. Later that day, an investigator found the skull of a child. Using dental records, investigators identified it as Timmy's skull. Told by Sayreville police detectives that a skull had been found at the Raritan Center and it was "most probably" Timmy's skull, defendant displayed "no reaction."

During the search, Butkiewicz found a partially-buried blanket within about twenty feet of the location where the skull was found. After dredging a portion of a creek that ran through the area, investigators found leg bones later identified as Timmy's and two waistbands that appeared to be the remnants of clothing. The blanket, sneakers, waistbands, and other items found were sent to an FBI laboratory for testing. That testing revealed no evidence. A Sayreville police officer showed defendant and her parents the blanket; they stated that they did not recognize it.

For more than two decades after Timmy's disappearance, there were no significant developments in the investigation, and no one was charged in connection with his death. Defendant moved to Florida, where she raised two sons and worked as a paralegal.

In 2011, an investigator reopened the investigation. He interviewed family members and friends of defendant and showed them the blanket and other items that had been discovered near Timmy's remains. Several witnesses, including witnesses who were familiar with the home, stated that they did not recognize the items. Blair-Dilcher, who was estranged from her aunt and cooperating with the police, stated that she recognized the blanket as one she had seen in defendant's home. In July 2014, a grand jury indicted defendant. After the indictment and before trial, Gerding and Matthews also stated that they recognized the blanket from defendant's home. None of the photographs introduced into evidence at the trial showed the blanket.

Defendant was tried before a jury over twenty-eight trial days beginning in March 2016. On the third day of jury deliberations, the trial court received a note from a juror stating that "[r]esearch was done by [Juror No. 1] as to the FBI's protocol back in the 1990s." The court immediately suspended deliberations. None of the eleven remaining jurors indicated that they had conducted independent research, and five denied knowledge of Juror No. 1's independent research. Six jurors stated that they had heard a comment about the juror's research regarding FBI protocols but said the comment had no effect on their ability to fairly decide the case. The trial court dismissed Juror No. 1 and substituted an alternate. In accordance with the applicable model jury charge, the trial court instructed the reconstituted jury to deliberate anew. The jury found defendant guilty of first-degree purposeful or knowing murder.

Defendant moved for a judgment of acquittal on the ground that the evidence was insufficient to support the jury's verdict. She also moved for a new trial based on the substitution of Juror No. 1. The trial court denied both motions, and defendant appealed. The Appellate Division affirmed. ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at

3

7-34). Limiting its review to the State's evidence, the court held that the State presented sufficient evidence to warrant denial of a judgment of acquittal. Id. at ___ (slip op. at 7-22). The court also affirmed the denial of defendant's motion for a new trial based on the dismissal and replacement of Juror No. 1. Id. at ___ (slip op. at 27-34).

The Court granted defendant's petition for certification. 241 N.J. 81 (2020).

**HELD:** The judgment of the Appellate Division upholding defendant's conviction is affirmed by an equally divided Court. Three members of the Court found the evidence sufficient and three members found the evidence insufficient to sustain the murder conviction. The six members of the Court who participated in this appeal unanimously modify the Appellate Division's holding with respect to its characterization of the scope of the evidence that should be considered in reviewing a post-verdict motion for a judgment of acquittal as explained on pages 28-32 of Justice Patterson's opinion. The Court also unanimously agrees with the Appellate Division that defendant was not entitled to a new trial because a juror substitution occurred, for the reasons set forth on pages 60-66 of Justice Patterson's opinion.

1. In State v. Reyes, the Court reviewed a trial court's denial of a defendant's motion for a judgment of acquittal of a charge of first-degree murder at the close of the State's case. 50 N.J. 454, 458 (1967). As the Court framed the test, "the question the trial judge must determine is whether, viewing the State's evidence in its entirety, . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt." Id. at 458-59. When a defendant moves for a judgment of acquittal after all the proofs, however, the court considers not only the evidence presented by the State, but "the entirety of the evidence." State v. Williams, 218 N.J. 576, 594 (2014). Accordingly, the Court does not concur with the Appellate Division's view that evidence presented by the defendant is irrelevant to the court's consideration when it reviews a post-trial motion for a judgment of acquittal notwithstanding the verdict under Rule 3:18-2, and the Court considers defendant's evidence in reviewing the trial court's determination. The Reyes standard accords with the federal appellate standard for review of the sufficiency of the evidence. (pp. 28-32)

2. There was no abuse of discretion in the trial court's response to the juror's misconduct. By virtue of his admitted violation of the court's instructions, the juror made clear that he was unable to continue his jury service under Rule 1:8-2(d)(1) for a reason personal to him, and the court properly dismissed him from the panel. The trial court confirmed that the remaining jurors were not tainted by the incident; the jurors -- including several who had heard the dismissed juror say that he had conducted independent research -- stated that they would not allow the incident to affect their ability to fairly decide the case. There is no evidence that the jury had reached a preliminary or final determination on any issue prior to the substitution. The trial court properly

instructed the reconstituted jury to deliberate anew, and the reconstituted jury heard playback of testimony and conducted deliberations before reaching its verdict. The Court shares the Appellate Division's view that the trial court properly exercised its discretion when it dismissed the juror, replaced him with an alternate rather than declaring a mistrial, instructed the reconstituted jury to begin deliberations anew, and denied defendant's post-trial motion under Rule 3:20-1 for a new trial. (pp. 60-66)

**JUSTICE PATTERSON, concurring,** writes that, when viewed in accordance with the Reyes standard, the evidence presented at trial -- including defendant's proofs -- is more than sufficient to support a reasonable jury's determination that defendant is guilty beyond a reasonable doubt of purposely or knowingly killing her son. Justice Patterson expresses the view that the evidence supports the following reasonable inferences: (1) one or more individuals killed Timmy and left his body in or near the creek at the Raritan Center; (2) defendant was present when her son's body was left there, and defendant chose a familiar location -- a desolate wooded area very close to her former workplace -- to dispose of her son's remains; (3) the blanket was deposited in the woods with Timmy's remains, and it came from defendant's home; (4) when defendant arrived at the carnival on May 25, 1991, she was aware that her son was already dead and that any search for him would be futile, and defendant gave law enforcement false and contradictory accounts of his abduction to deflect attention from her own culpability and impede the investigation of her son's disappearance; (5) defendant had a motive to kill her son; and (6) Timmy died as the result of a homicide. Justice Patterson reviews the evidence presented by defendant and concludes that it does not negate the State's evidence. Justice Patterson concurs with the Appellate Division's decision affirming the denial of defendant's post-trial motion for a judgment of acquittal notwithstanding the verdict under Rule 3:18-2.

**JUSTICE ALBIN, dissenting,** expresses the view that the direct and inferential evidence -- viewed in the light most favorable to the State -- cannot rationally justify the murder conviction of Michelle Lodzinski. Noting that a murder conviction cannot rest on speculation, Justice Albin writes that the sustaining of the conviction in this case on such a paucity of evidence has no parallel in this state. Justice Albin also points out that Lodzinski's status as a single working mother was not a motive for murder and that, among other factors casting doubt on the identification of the blanket, Lodzinski's estranged niece identified the blanket after first collaborating with the police. Justice Albin writes that there is no evidence of how Timothy Wiltsey died or the circumstances of his death. Even if the evidence suggests that Lodzinski had some knowledge or even involvement in Timothy's death, Justice Albin observes, there is absolutely no evidence that she purposely or knowingly caused his death, and there is no evidence to distinguish whether Timothy died by accident or by the negligent, reckless, or purposeful or knowing acts of a person -- even if that person were Lodzinski. Justice Albin notes that not even the State's medical examiner, in opining on the manner of death, distinguished between negligent, reckless, and purposeful or knowing homicide. Justice Albin stresses that due

5

process requires that the State establish beyond a reasonable doubt every element of the offense, including the accused's state of mind, which is an essential element necessary to support a murder conviction.

**The Appellate Division's judgment upholding defendant's conviction is upheld by an equally divided Court, and the Court unanimously modifies the Appellate Division's holding as to the standard of review on a post-verdict motion for a judgment of acquittal.**

**JUSTICE PATTERSON filed a concurrence, joined by JUSTICES FERNANDEZ-VINA and SOLOMON.  JUSTICE ALBIN filed a dissent, joined by JUSTICES LaVECCHIA and PIERRE-LOUIS.  CHIEF JUSTICE RABNER did not participate.**

# SUPREME COURT OF NEW JERSEY
## A-50 September Term 2019
## 083398

State of New Jersey,

Plaintiff-Respondent,

v.

Michelle Lodzinski,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| October 27, 2020 | May 26, 2021 |

Gerald Krovatin and David W. Fassett argued the cause for appellant (Krovatin Nau and Arseneault & Fassett, attorneys; Gerald Krovatin, David W. Fassett, and Gregory D. Jones, on the briefs).

Joie D. Piderit, Acting Assistant Prosecutor/Special Deputy Attorney General, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Joie D. Piderit, of counsel and the briefs).

Lawrence S. Lustberg argued the cause for amici curiae American Civil Liberties Union of New Jersey and Association of Criminal Defense Lawyers of New Jersey (Gibbons and American Civil Liberties Union of New Jersey Foundation, attorneys; Lawrence S. Lustberg,

Michael R. Noveck, Alexander Shalom, and Jeanne LoCicero, on the brief).

Paul J. Casteleiro argued the cause for amicus curiae Centurion Ministries, Inc., d/b/a Centurion (Centurion and Fox Rothschild, attorneys; Paul J. Casteleiro, of counsel and on the brief, and Karen A. Confoy, Jack L. Kolpen, Dominique J. Carroll, and Allison L. Hollows, on the brief).

Debra G. Simms, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Debra G. Simms, of counsel and on the brief).

---

PER CURIAM

---

The judgment of the Appellate Division is affirmed by an equally divided Court, but the six members of the Court who participated in this appeal unanimously modify the Appellate Division's holding with respect to its characterization of the scope of the evidence that should be considered in reviewing a post-verdict motion for a judgment of acquittal. See State v. Lodzinski, ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 7-9). The Court's articulation of the appropriate scope of review is set forth in Justice Patterson's concurring opinion. See infra at ___ (slip op. at 28-32).

The Court also unanimously affirms the Appellate Division's affirmance of the trial court's ruling that defendant Michelle Lodzinski was not entitled to a new trial because a juror substitution occurred, see Lodzinski, ___ N.J.

2

Super. at ___ (slip op. at 27-34), for the reasons set forth in Justice Patterson's opinion, see infra at ___ (slip op. at 60-66).

JUSTICE PATTERSON filed a concurrence, joined by JUSTICES FERNANDEZ-VINA and SOLOMON. JUSTICE ALBIN filed a dissent, joined by JUSTICES LaVECCHIA and PIERRE-LOUIS. CHIEF JUSTICE RABNER did not participate.

JUSTICE PATTERSON, concurring.

Defendant Michelle Lodzinski appeals the Appellate Division's decision affirming her conviction of the first-degree purposeful or knowing murder of her five-year-old son. She challenges her conviction on two grounds.

First, defendant contends that she was entitled to a judgment of acquittal notwithstanding the verdict under Rule 3:18-2 because the evidence presented was insufficient to support the jury's verdict that she was guilty beyond a reasonable doubt.

We review the trial court's denial of defendant's motion for a judgment of acquittal notwithstanding the verdict in accordance with State v. Reyes, 50 N.J. 454, 458-59 (1967). When a defendant moves for a judgment of acquittal after the verdict, we consider the evidence in its entirety, including the evidence that defendant presented. State v. Williams, 218 N.J. 576, 594 (2014). Affording to "the State the benefit of all its favorable testimony as

3

well as all of the favorable inferences which reasonably could be drawn therefrom," we determine whether a reasonable jury could find defendant guilty beyond a reasonable doubt of purposeful or knowing murder. Reyes, 50 N.J. at 459.

Viewed in accordance with the Reyes standard, the evidence presented at trial -- including defendant's proofs -- is more than sufficient to support a reasonable jury's determination that defendant is guilty beyond a reasonable doubt. We therefore concur with the Appellate Division that the trial court properly denied defendant's motion for a judgment of acquittal notwithstanding the verdict under Rule 3:18-2.

Second, defendant argues that she is entitled to a new trial pursuant to Rule 3:20-1 because the trial court dismissed a juror who contravened its instructions by conducting independent research, and replaced that juror with an alternate instead of declaring a mistrial.

We find no abuse of discretion in the trial court's response to the juror's misconduct. By virtue of his admitted violation of the court's instructions, the juror made clear that he was unable to continue his jury service under Rule 1:8-2(d)(1) for a reason personal to him, and the court properly dismissed him from the panel. The trial court confirmed that the remaining jurors were not tainted by the incident; the jurors -- including several who had heard the

4

dismissed juror say that he had conducted independent research -- stated that they would not allow the incident to affect their ability to fairly decide the case.  There is no evidence that the jury had reached a preliminary or final determination on any issue prior to the substitution.  The trial court properly instructed the reconstituted jury to deliberate anew, and the reconstituted jury heard playback of testimony and conducted deliberations before reaching its verdict.  Accordingly, we concur with the Appellate Division that defendant is not entitled to a new trial.

I.

A.

1.

Timothy Wiltsey (Timmy) was born in Iowa on August 6, 1985.[1]  He was the son of defendant, then seventeen years old, and George Wiltsey, an eighteen-year-old resident of Iowa.  When Timmy was six months old, defendant moved with him to New Jersey, her home state.

After defendant and Timmy arrived in New Jersey, they moved into the home of her sister and brother-in-law, Linda and David Hisey.  When Timmy was about two and a half years old, defendant and Timmy moved into their

---

[1] We summarize the facts based on the trial record, and the record submitted to the trial court in pre-trial and post-trial motions.

own apartment in South Amboy. They later moved to two different apartments, also in South Amboy.

Defendant worked for a series of employers following her return to New Jersey. For approximately six months in 1988 and 1989, defendant worked as a secretary for Florida Fulfillment, a direct mail business, at its New Jersey office located at Raritan Center in Edison. Raritan Center was described at trial as a hotel, office building, and warehouse complex with extensive wooded areas surrounding the commercial buildings and a stream known as Red Root Creek running through a portion of the property.

After leaving her job at Florida Fulfillment, defendant worked for a few months at a law firm. In February 1991, she started a new job as a secretary at Consumers, a retail catalogue service located in Edison.

When defendant lived in her first apartment in South Amboy, a teenage neighbor, Dawn Matthews, babysat for Timmy. Later, following defendant's move to a different neighborhood in South Amboy, her niece Jennifer Blair, later Jennifer Blair-Dilcher, became Timmy's primary babysitter. When she babysat for Timmy, Blair-Dilcher was sometimes accompanied by her friend Danielle Gerding.

Shortly after Timmy's fifth birthday, defendant enrolled him in kindergarten at St. Mary's School in South Amboy for the 1990-1991 school

6

year. The school nurse at St. Mary's described Timmy as a good boy who was healthy but was frequently late for school. School records reflect that Timmy arrived late for school sixty-three times during his kindergarten year and was absent on an additional twenty-five school days.

The record contains no indication that defendant was ever accused of abusing Timmy prior to the murder charge against her. Several witnesses testified at trial that they viewed her to be a loving and dedicated mother to her son, and that she considered the child her first priority.

## 2.

On Friday, May 24, 1991, defendant and Timmy visited the home of her brother's former girlfriend and offered to take defendant's niece, who was approximately Timmy's age, to a carnival at Kennedy Park in Sayreville the following day. The next day, however, defendant did not pick up her niece for the carnival or contact the child's mother.

A neighbor testified that on the morning of Saturday, May 25, 1991, she saw Timmy playing with another child in the street near his home; she stated that she shouted at him to get off the street and that he complied with her instruction.

That evening, Timmy's babysitters, Blair-Dilcher and Gerding, went to the carnival in Sayreville and looked for defendant and Timmy. They found

7

defendant standing alone. Defendant said that she did not know where Timmy was and that he had been missing for fifteen minutes.

Blair-Dilcher and Gerding immediately began searching for Timmy. Between 7:45 p.m. and 8:00 p.m., Gerding notified an auxiliary police officer, Kevin Skolnik, that her friend's son was missing. Skolnik approached defendant and inquired about the missing child. Defendant, who did not appear to the officer to be upset, said that "she went to get her soda, she turned her back and her son was missing." Defendant told Skolnik that Timmy "had Ninja Turtle sneakers, he had a crew cut, [and] a t-shirt on."

Skolnik initially joined defendant in searching for Timmy and then informed his lieutenant, who in turn notified the Sayreville Police Department. Officer Timothy Brennan interviewed defendant, who again said that after she purchased a soda, she turned around and Timmy was gone.

Carnival employees and defendant made announcements over the loudspeaker about the missing boy, and police officers shut down the carnival rides. Sayreville police officers and firefighters conducted an extensive search of the carnival site and the surrounding area, but failed to locate Timmy. They searched defendant's car, which was parked at the back of a school near the carnival, but found no evidence relating to Timmy's disappearance. After

8

several hours, the search for Timmy was suspended for the night and then resumed early in the morning of May 26, 1991.

That morning, defendant gave an audiotaped statement to a Sayreville police officer, Detective Richard Sloan. She stated that on the afternoon of May 25, 1991, she took Timmy to Holmdel Park in Holmdel, where they remained from 3:00 p.m. until 6:00 or 6:30 p.m. Defendant said that she then drove Timmy to the Sayreville carnival. She stated that they arrived at the carnival at 7:00 p.m. and that Timmy went on three rides. Defendant told Sloan that a half hour after they arrived at the carnival, she went to a concession stand to get a soda, leaving Timmy "on the side of the trailer over where [she] could see him," and when she turned around "he was gone." She said that when Timmy disappeared, he was wearing "a red tank top, red printed jam shorts that had black letters on it and little green men," and Ninja Turtle sneakers.

On May 28, 1991, Sayreville police searched defendant's apartment. They found no evidence relevant to their search for Timmy.

In the days that followed, defendant gave police a series of inconsistent statements regarding her son's disappearance.

On June 4, 1991, defendant provided a handwritten statement to the Federal Bureau of Investigation (FBI), which participated in the case because

of the possibility that Timmy was the victim of an interstate kidnapping. In that statement, defendant reiterated her original account of Timmy's disappearance.

In a meeting two days later with Sloan and another Sayreville officer, Detective Raymond Szkodny, defendant told the officers to "go ahead and charge me if you think you could." According to the officers' report of the interview, defendant told them that at the carnival, she saw an "older man" taking Timmy off a ride. She stated that the man walked with the child toward the tennis courts at the park, "met up with a younger man," and that when she yelled at the man, he "turned towards her and stated '[S]tay away or we will hurt the boy.'" Defendant said to the officers, "You wanted to hear something so I told you that." She abruptly walked out of the interview and left the police station, but the officers caught up with her and drove her home. At a meeting later that day, defendant admitted that she had "made up th[e] story about those two men."

On June 7, 1991, defendant gave another recorded statement to Sloan. For the first time, defendant implicated a woman whom she identified as "Ellen" in Timmy's abduction. Defendant stated that she had met Ellen, whose last name she did not recall, when defendant worked as a teller at a local bank in 1986 and 1987. She described Ellen as a "go-go girl" who drove

a Camaro and cashed welfare checks at the bank using an identification card required under bank procedure.

Defendant said that at the carnival in Sayreville on May 25, 1991, she encountered Ellen, who was dressed in a black "jump suit or shorts suit." She said that Ellen was accompanied by two men in their twenties or thirties, both about 6'3", and a two- or three-year-old girl. According to defendant, Ellen offered to watch Timmy while defendant purchased a soda, but when defendant returned, Timmy, Ellen, the two men, and the little girl were gone.[2]

On June 13, 1991, interviewed by New Jersey State Police detectives, defendant provided a different version of the events of May 25, 1991. According to one detective's testimony, defendant said that she encountered Ellen, accompanied by her daughter and two white males, at the carnival. Defendant told the detectives that after Ellen offered to put Timmy on a ride while defendant bought a drink, one of the men threatened defendant with a

---

[2] On the same day, according to a statement by defendant's former boyfriend, defendant said that she had encountered Ellen with a man and a little girl at the carnival, and after the group accompanied her to her car to get money to pay for Timmy to go on a ride, "the woman pulled a knife and put it to Timmy, and -- and she took him in the car, and they drove off." At the request of the investigating officers, defendant's former boyfriend participated in two consensual intercepts of conversations between him and defendant. In a recorded call, defendant gave an account consistent with her June 7, 1991 statement to police; she said that Ellen, who was at the carnival with two men and a little girl, offered to watch Timmy while defendant purchased a drink, and when defendant returned, the group had vanished.

11

knife.  According to the detective, defendant initially described the knife as a long hunting knife but later said it was a pocket knife.  The detective stated that defendant said that "at first, she was frightened, and then she kind of thought it was just a joke, and she turned around and looked and Timmy was still there at the ride, so she continued to the confectionary stand to get the soda."[3]  The officers confronted defendant with the discrepancies in her account regarding the number of men involved in her son's abduction and the description of the knife; defendant walked out of the interview and declined to speak further with the State Police.

In a recorded statement to Sayreville police officers later that day, defendant said that her statement to police on May 26, 1991 had been untrue and explained that she had been "afraid to tell the truth" because she feared that the person who took Timmy "was going to hurt him."  Defendant stated,

> When I went to go get a drink the man came up behind me, the one with the gray and brown hair, put his arm around me and showed a knife and said that Timmy is cute and if I didn't want anything to happen to that face I would keep my mouth shut and keep walking, and I

---

[3]  A witness who was not acquainted with defendant but recognized her from press accounts testified that she was behind defendant in line at the concession stand at the Sayreville carnival on the evening of May 25, 1991.  The witness stated that she briefly spoke with defendant while they were in line, and that when defendant declined to order anything, the concession operator served her instead.  She testified that she later saw defendant with a "concerned" look on her face talking to an auxiliary officer.

12

> might see him, in a month I'd get a phone call if I didn't say anything.

Following up on defendant's statement, police officers contacted local banks and investigated all women named "Ellen" or with similar names who had received welfare benefits in Middlesex County during the time period in which defendant said she became acquainted with "Ellen."  They identified no individual meeting defendant's description of "Ellen."

3.

On October 26, 1991, a man walking near Olympic Drive at the Raritan Center found a child's left sneaker with Ninja Turtle images on it.  The man was aware of defendant's description of Timmy's clothing at the time of his disappearance because he had read press reports on the case.  He put the sneaker in a plastic bag and delivered it to Sayreville police.

The sneaker was found approximately four-tenths of a mile from the office of defendant's former workplace, Florida Fulfillment, at the Raritan Center.

Szkodny met with defendant, showed her the sneaker, and told her that it had been found on Olympic Drive at the Raritan Center.  According to Szkodny, defendant did not tell him that she had worked at the Raritan Center.  Szkodny stated that defendant told him that the sneaker he showed to her was not her son's sneaker.  About a month later, after the discovery of the sneaker

was disclosed to the media by the man who found it, defendant asked to view the sneaker again.  This time, defendant indicated to Szkodny that "[i]t could be his sneaker."  The serial number on the sneaker matched the serial number on the box that had contained sneakers purchased by defendant for her son about a week before he disappeared.

On March 4, 1992, FBI Agent Ronald Butkiewicz and another FBI agent interviewed defendant with her attorney present.  Defendant stated that she first saw Ellen with two men and a little girl at the carnival on May 25, 1991, and that Ellen later approached her, accompanied by only one man and a little girl.  Defendant stated that she told Ellen that she wanted a soda, but Timmy wanted to go on a ride.  Defendant said that she accepted Ellen's offer to watch Timmy on the ride while defendant walked seventy-five to eighty yards to a concession stand.

Defendant told the FBI agents that as she walked through a "bushy area" on the way to the concession stand, the man whom she had earlier seen with Ellen accosted her, put his arm around her shoulder, and threatened her with a knife.  She stated that the man told her that her son was a "cute kid" and if she wanted him "to stay that way," she should "keep walking," and that she would "possibly hear from him in a month or so."  According to Butkiewicz, defendant told the agents that after the man let her go, she briefly looked back

14

and saw her son with Ellen but did not return to the boy. She said that she went to the concession stand, chose the shortest line, bought a soda, and looked for her son.

The following month, Butkiewicz interviewed defendant's mother, who disclosed that defendant had previously worked for Florida Fulfillment at the Raritan Center. Butkiewicz interviewed defendant again and asked her to provide a list of all employers for whom she had worked since completing her education. Defendant listed Florida Fulfillment as a former employer. Asked where Florida Fulfillment was, defendant identified it as a "Florida-based" company. When asked directly for Florida Fulfillment's New Jersey location, she identified the Raritan Center.

4.

On April 23 and 24, 1992, investigators from the FBI, the New Jersey State Police, the Middlesex County Prosecutor's office and the Sayreville Police Department searched a wooded area on the Raritan Center property.

On the first day of the search, a right sneaker with Ninja Turtle images on it was found. It was later identified as the other half of the pair of sneakers purchased by defendant for Timmy.

Later that day, a New Jersey State Police investigator found the skull of a child in the stream bed of Red Root Creek at Raritan Center. Using dental

15

records, investigators identified it as Timmy's skull. Told by Sayreville police detectives that a skull had been found at the Raritan Center and it was "most probably" Timmy's skull, defendant displayed "no reaction."

During the search, Butkiewicz found a partially-buried blanket within about twenty feet of the location where the skull was found. Although a police photographer was present, Butkiewicz did not direct that the blanket be photographed while it remained in the ground. Challenged at trial for a breach of forensic procedure, Butkiewicz stated that the "routine in the FBI" was not to "routinely photograph every single piece of evidence at a crime scene individually and then take measurements in reference to other known locations at the crime scene."

In the same area, investigators also found a pillowcase and a Mylar balloon decorated with images of Ninja Turtles.

After dredging a portion of Red Root Creek, investigators found leg bones later identified as Timmy's and two waistbands that appeared to be the remnants of clothing.

The blanket, pillowcase, sneakers, waistbands, and balloons were sent to an FBI laboratory for testing. That testing revealed no trace evidence, biological evidence, or fingerprints. A Sayreville police officer showed

16

defendant and her parents the blanket found at Raritan Center; they stated that they did not recognize the blanket.

For more than two decades after Timmy's disappearance, there were no significant developments in the investigation, and no one was charged in connection with his death. Defendant moved to Florida, where she lived near several members of her family, raised two sons, and worked as a paralegal.

5.

In 2011, Scott Crocco, an investigator with the Middlesex County Prosecutor's Office, received a tip regarding Timmy's disappearance. The tip turned out to be inaccurate, but it prompted Crocco to reopen the investigation.

Crocco interviewed family members and friends of defendant, and showed them the blanket, pillowcase and other items that had been discovered near Timmy's remains at the Raritan Center. Several of the individuals interviewed by Crocco stated that they did not recognize the items. Blair-Dilcher "immediately stated that she recognized the blanket" as one she had seen in defendant's home. Gerding similarly stated that she recognized the blanket as defendant's. Matthews also told Crocco that she had seen the blanket at defendant's home.[4]

---

[4] Crocco submitted the blanket and pillowcase to the New Jersey State Police laboratory for additional testing. A single human hair was found on each item. However, mitochondrial DNA testing as to the identity of the person whose

17

B.

1.

On July 31, 2014, a grand jury indicted defendant of first-degree murder in violation of N.J.S.A. 2C:11-3(a)(1) and (a)(2).

Defendant was tried before a jury over twenty-eight trial days, beginning on March 16, 2016. In its initial instructions to the jury, the trial court directed the jurors not to conduct independent research and to decide the case solely on the evidence.

The State presented the testimony of law enforcement officers; family members and friends of defendant; individuals present at the Sayreville carnival on May 25, 1991; and other fact witnesses. It also presented the testimony of Donna Fontana, an expert on forensic anthropology; Geetha Natarajan, M.D., an expert on anatomical, clinical, and forensic pathology; Mark Kataryniak, an expert on civil engineering; Jay Kartagener, an expert on forensic odontology; Edward Gainsborg, an expert on forensic science trace evidence analysis; and Charity Holland, an expert on forensic mitochondrial DNA analysis.

---

hair was located on the items was inconclusive, and no match between either hair and defendant or Blair-Dilcher was revealed.

18

At the close of the State's case, defendant moved to dismiss her indictment pursuant to Rule 3:18-1 and this Court's decision in Reyes.  The trial court denied defendant's motion.

Defendant presented the testimony of law enforcement officers; members of defendant's family; friends of defendant; several individuals who had reported seeing a boy resembling Timmy at the Sayreville carnival on May 25, 1991; and witnesses who implicated individuals other than defendant in Timmy's murder.  Defendant also presented the testimony of Howard Ryan, an expert on crime scene investigation and reconstruction, and Nicholas Petraco, an expert on criminology and trace evidence.

In rebuttal, the State presented additional fact witnesses to counter defendant's evidence of third-party guilt and to address defendant's contention that Butkiewicz improperly handled the blanket found at the Raritan Center.

In addition to the charged offense of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2), the trial court instructed the jury regarding the lesser included offenses of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1).

2.

On the third day of jury deliberations, the trial court received a note from a juror stating that "[r]esearch was done by [Juror No. 1] as to the FBI's protocol back in the 1990s." The court immediately suspended deliberations.

Questioned by the trial judge, Juror No. 1 admitted that he had conducted research on his personal computer, and that the research "in a way swayed my thinking." Juror No. 1 stated that he had searched the internet for whether "the FBI photographs evidence," and that the research "really didn't say anything," except that in the 1800s, photographing evidence was "cutting edge." Asked about conversations with other jurors regarding his research, Juror No. 1 said "we were talking about photographing evidence," that "one [juror] was in the restroom, so it was -- it was more in passing, waiting to continue." Juror No. 1 explained that he had said "the FBI should photograph evidence in place," adding, "[a]nd I said that before. I mean, the very first day that we deliberated, it was my stance."

The trial court then spoke individually with the remaining jurors, inquiring as to whether any juror had conducted independent research or received information outside of the trial evidence. None of the eleven remaining jurors indicated that they had conducted independent research, and five denied knowledge of Juror No. 1's independent research. Six jurors stated

that they had heard a comment about the juror's research regarding FBI protocols. The trial court further questioned each of those jurors, cautioning them to avoid revealing the substance of the jury's deliberations. The jurors said that Juror No. 1's comment about FBI photography protocols had no effect on their ability to fairly decide the case.

The following day, defense counsel stated that although defendant was not at that point moving for a mistrial, she objected to the dismissal of Juror No. 1, arguing that the juror did not taint the jury pool. The State argued in favor of the dismissal of Juror No. 1 but agreed that the juror did not taint the jury pool.

The trial court dismissed Juror No. 1 from further service on the jury and substituted an alternate for the departed juror. In accordance with the applicable model jury charge, the trial court instructed the reconstituted jury to deliberate anew. See Model Jury Charges (Criminal), "Judge's Instructions When Alternate Juror Empaneled After Deliberations Have Begun" (rev. March 14, 2016).

The jury listened to readbacks of testimony for about a half hour and deliberated for part of the afternoon. The next morning, the jury further deliberated and then announced that it had reached a verdict. The jury found

21

defendant guilty of first-degree purposeful or knowing murder contrary to N.J.S.A. 2C:11-3(a)(1) and (a)(2).

3.

Defendant moved pursuant to <u>Rule</u> 3:18-2 for a judgment of acquittal notwithstanding the verdict on the ground that the evidence was insufficient to support the jury's verdict of guilty beyond a reasonable doubt. She also moved pursuant to <u>Rule</u> 3:20-1 for a new trial, contending that the trial court should have declined to substitute an alternate for Juror No. 1 or ruled that the jury was tainted and declared a mistrial.

The trial court denied both motions. With respect to the sufficiency of the evidence, the court noted that it had, "on many occasions, limited the [State's] presentation of evidence it found to be in violation of the Rules of Evidence" and that the "past indiscretions and biases" of the State's witnesses who identified the blanket were "fully on display before this jury." The court also cited its instruction to the jury on the use of direct and circumstantial evidence. It observed that the jury "was persuaded that the blanket in question, with its evidential deficiencies, was from the home and so found."

As to the replacement of Juror No. 1 with an alternate, the trial court noted that it had clearly instructed the jurors that they were not investigators and that Juror No. 1's admitted disregard of those instructions was personal to

22

him.  The court held that the jury's pre-substitution deliberations were not so advanced as to bar meaningful deliberations by the reconstituted jury, which deliberated for several hours before reaching a verdict.  Finally, the trial court rejected a defense suggestion that it consider the substituted juror's post-verdict comments to the press about the views of some of the jurors.

The court sentenced defendant to a thirty-year term of incarceration subject to a thirty-year period of parole ineligibility and the application of jail credits, plus fines and penalties.

## C.

### 1.

Defendant appealed her conviction, challenging the trial court's denial of her motion for a judgment of acquittal notwithstanding the verdict and its denial of her motion for a new trial based on the dismissal of Juror No. 1 and the substitution of an alternate.

The Appellate Division affirmed defendant's conviction.  State v. Lodzinski, ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 7-34).  It reiterated this Court's test for a motion for a judgment of acquittal:  whether the evidence, viewed in its entirety and "giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom," is sufficient "that a jury could properly find

23

beyond a reasonable doubt that the defendant was guilty of the crime charged."

Id. at ___ (slip op. at 7) (quoting State v. D.A., 191 N.J. 158, 163 (2007))  The

Appellate Division noted that a jury may draw an inference from that evidence

"whenever it is more probable than not that the inference is true," and need not

find that inference beyond a reasonable doubt.  Id. at ___ (slip op. at 8-9)

(quoting State v. Brown, 80 N.J. 587, 592 (1979)).  Limiting its review to the

State's evidence, the court held that the State presented sufficient evidence to

warrant denial of defendant's motion for a judgment of acquittal.  Id. at ___

(slip op. at 7-22).

The Appellate Division also affirmed the trial court's denial of

defendant's post-trial motion for a new trial based on the dismissal and

replacement of Juror No. 1.[5]  Noting that the jury's deliberations before the

substitution of the alternate were not protracted, the Appellate Division held

that the trial court did not abuse its discretion when it concluded that Juror No.

1's independent research mandated his removal and that the circumstances

were exclusively personal to that juror.  Id. at ___ (slip op. at 27-34).

---

[5]  The Appellate Division also rejected defendant's challenge to the trial
court's denial of her pretrial motion to dismiss the indictment, based on the
twenty-three year delay between the offense alleged and her indictment.  Id. at
___ (slip op. at 22-24).  Defendant did not raise that issue before this Court.

24

2.

We granted defendant's petition for certification.  241 N.J. 81 (2020).

We also granted amicus curiae status to the American Civil Liberties Union of

New Jersey and the Association of Criminal Defense Lawyers of New Jersey,

appearing jointly; Centurion Ministries, Inc.; and the Attorney General.

II.

A.

Defendant contends that the Appellate Division denied her due process

under the standard set forth by the United States Supreme Court's decision in

Jackson v. Virginia, 443 U.S. 307, 317 (1979), because the court assessed only

the State's evidence, not the entirety of the evidence.  Defendant views the

trial evidence to be inadequate to sustain her conviction.  She asserts that the

State did not prove beyond a reasonable doubt that Timmy died as a result of a

homicide rather than an accident.  Defendant also contends that the State did

not satisfy the element of causation because the evidence of her motive, her

inconsistent statements, and her demeanor following her son's disappearance

do not constitute proof that she caused his death.  Defendant argues that she is

entitled to a new trial by virtue of the trial court's dismissal of Juror No. 1 and

its replacement of that juror with an alternate.  She claims that the jury's

deliberations were too far advanced for the reconstituted jury to engage in

25

meaningful deliberations and that the dismissed juror's independent research tainted the verdict.

B.

The State contends that the <u>Reyes</u> standard comports with federal due process standards for the sufficiency of evidence presented at a criminal trial and that the trial court and Appellate Division properly applied that standard to the evidence in this case. The State cites trial testimony that defendant had a motive to kill Timmy, that she was the sole individual with the opportunity to cause her son's death, and that she repeatedly misled investigators about his disappearance. According to the State, defendant's contradictory statements, demeanor, and conduct after her son's disappearance constitute evidence of her guilt. As to the cause of Timmy's death, the State argues that, because defendant had attended to Timmy's medical needs when he sustained a dog bite, she would have done the same had Timmy suffered an accident; the State also relies on its expert opinion on the cause of the child's death. Finally, the State asserts that the trial court properly exercised its discretion when it dismissed and replaced Juror No. 1 because the juror proved incapable of following the court's direction, the misconduct was personal to that juror, deliberations had not progressed so far as to foreclose meaningful

26

deliberations, and the remaining jurors confirmed that they could fairly decide the case.

## C.

Amici curiae the American Civil Liberties Union of New Jersey and the Association of Criminal Defense Lawyers of New Jersey assert that not only the State's evidence, but also defense evidence, should be considered on a post-trial motion for a judgment of acquittal. Amici urge the court to reverse the Appellate Division's decision or remand to the Appellate Division for a review of the evidence that defendant presented.

## D.

Amicus curiae Centurion Ministries, Inc., argues that the New Jersey standard for a motion for a judgment of acquittal under Rule 3:18-1 or Rule 3:18-2 precludes consideration of defense evidence, and thus violates a defendant's due process rights. Amicus urges the Court to require trial courts deciding such motions to consider defense evidence as well as the State's evidence.

## E.

Amicus curiae the Attorney General asserts that the trial court properly replaced Juror No. 1 with an alternate, given the personal nature of the juror's

misconduct, the timing of the substitution, and the evidence that the juror's research did not taint the other jurors.

III.

A.

1.

We review de novo the trial court's denial of defendant's motion for a judgment of acquittal notwithstanding the verdict. State v. Jones, 242 N.J. 156, 168 (2020); Williams, 218 N.J. at 593-94. When an appellate court considers a sufficiency-of-the-evidence challenge to a conviction, it reviews the record evidence using the same standard that governed the trial court and "determine[s] therefrom how the motion should have been decided." State v. Josephs, 174 N.J. 44, 81 (2002) (quoting State v. Gora, 148 N.J. Super. 582, 596 (App. Div. 1977)).

2.

Our court rules authorize a defendant to move for a judgment of acquittal at the close of the State's case or after all of the evidence has been presented, pursuant to Rule 3:18-1. A defendant may also move for a judgment of acquittal following the jury's return of a verdict, or the jury's discharge without having returned a verdict, under Rule 3:18-2.

In Reyes, the Court reviewed a trial court's denial of a defendant's motion for a judgment of acquittal of a charge of first-degree murder at the close of the State's case. 50 N.J. at 458. As the Court framed the test,

> the question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [Id. at 458-59.]

When a court applies the Reyes standard, it determines whether the "evidence would enable a reasonable jury to find that the accused is guilty beyond a reasonable doubt of the crime or crimes charged." State v. Perez, 177 N.J. 540, 549 (2003) (citing Reyes, 50 N.J. at 459). In that inquiry, "a jury may draw an inference from a fact whenever it is more probable than not that the inference is true" and need not find that inference beyond a reasonable doubt. State v. Brown, 80 N.J. 587, 592 (1979). "It is not fatal to the State's case" if certain circumstances "permit of some other rational explanation of defendant's conduct or fail to exclude every other conceivable hypothesis except guilt." Id. at 599.

In the procedural setting of Reyes, in which the defendant moved at the close of the State's case for a judgment of acquittal, the Court held that "no

29

consideration may be given to any evidence or inferences from the defendant's case." 50 N.J. at 459; see also State v. Fiorello, 36 N.J. 80, 86-87 (1961) (noting that a motion for a judgment of acquittal at the close of the State's case is decided "in the light of the evidence at that time without reference to any corroborative evidence introduced during the defendant's case.")

When a defendant moves for a judgment of acquittal after all the proofs, however, the court considers not only the evidence presented by the State, but "the entirety of the evidence."[6] Williams, 218 N.J. at 594; see also State v. Fuqua, 234 N.J. 583, 590-91 (2018) (noting that a court determining a motion for a judgment of acquittal evaluates "the evidence, viewed in its entirety, be it direct or circumstantial") (quoting State v. Kluber, 130 N.J. Super. 336, 341-42 (App. Div. 1974)); Josephs, 174 N.J. at 86 (holding that, in an appeal of a trial court's denial of a post-verdict motion for a judgment of acquittal, "we examine the sufficiency of the evidence by viewing it in its entirety and by giving the State the benefit of all reasonable inferences that can be drawn from the evidence in its favor"); State v. Mayberry, 52 N.J. 413, 436-37 (1968)

---

[6] The Court's articulation of the test for a post-verdict motion for a judgment of acquittal in State v. Samuels, 189 N.J. 236, 245 (2007) -- that the court deciding such a motion should "confine [its] analysis of the adequacy of the evidence to the State's case and the inferences to be derived therefrom" -- was a departure from our law. The Court clarified the correct standard for close-of-evidence motions in Williams, 218 N.J. at 594, and the Williams standard applies to post-verdict motions as well.

("[T]he proper issue is simply whether the evidence, viewed in its entirety including the legitimate inferences therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond reasonable doubt.").

Accordingly, we do not concur with the Appellate Division's view that evidence presented by the defendant is irrelevant to the court's consideration when it reviews a post-trial motion for a judgment of acquittal notwithstanding the verdict under Rule 3:18-2. See Lodzinski, ___ N.J. Super. at ___ (slip op. at 7-9). We consider defendant's evidence in our review of the trial court's determination.

3.

We do not agree with defendant's contention that New Jersey's standard for a motion for acquittal notwithstanding the verdict falls short of federal due process requirements.

The federal constitutional standard derives from the Sixth and Fourteenth Amendment guarantee "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson, 443 U.S. at 316; see also In re Winship, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects

the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Applying that standard, federal courts determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. As the Supreme Court noted, that "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Ibid.

New Jersey's standard does not diverge from federal constitutional norms; like the Jackson test, it requires the reviewing court to consider the evidence in the light most favorable to the prosecution, giving the State the benefit of all favorable inferences, and to determine whether a reasonable jury could find guilt beyond a reasonable doubt. Reyes, 50 N.J. at 458-59.

As we have stated, "the Reyes standard is in full accord with the federal appellate standard for review of the sufficiency of the evidence. It is the apt standard of review here." Josephs, 174 N.J. at 137.

B.

At defendant's trial, the State had the burden to prove beyond a reasonable doubt that defendant was guilty of Timmy's purposeful or knowing

32

murder, contrary to N.J.S.A. 2C:11-3(a)(1) and (a)(2). Under our Criminal Code, "criminal homicide constitutes murder when: (1) [t]he actor purposely causes death or serious bodily injury resulting in death; or (2) [t]he actor knowingly causes death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3(a).

Pursuant to the Legislature's definition of the statutory term "purposely,"

> [a] person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist.

> [N.J.S.A. 2C:2-2(b)(1).]

Under the Legislature's definition of the term "knowingly,"

> [a] person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result.

> [N.J.S.A. 2C:2-2(b)(2).]

The State also had the burden of proving causation in two distinct respects. First, N.J.S.A. 2C:2-3(a)(1) required the State to prove beyond a

33

reasonable doubt that defendant's conduct was "an antecedent but for which the result in question would not have occurred," termed "but-for causation." See State v. Buckley, 216 N.J. 249, 263 (2013) (noting the State's burden under N.J.S.A. 2C:2-3(a) to prove that "the event would not have occurred absent the defendant's conduct"). Here, the State was required to prove beyond a reasonable doubt that Timmy's death would not have occurred absent defendant's conduct.

Second, the State was required to prove beyond a reasonable doubt the element of causation under N.J.S.A. 2C:2-3(b). The statute provides that

> [w]hen the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation, as the case may be, of the actor, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.
>
> [N.J.S.A. 2C:2-3(b).]

As explained by a leading commentator on the Code, "[w]here an offense requires purpose, the result must be the kind of result designed by the actor; where an offense requires knowledge, the result must be the kind contemplated even if it is not the precise injury contemplated nor occurs in the

34

way contemplated."  Cannel, <u>New Jersey Criminal Code Annotated</u>, cmt. 4 on

N.J.S.A. 2C:2-3 (2020).

The State was permitted to rely entirely on circumstantial evidence, and

was not required to present direct evidence of defendant's guilt, as long as it

proved the elements of the offense beyond a reasonable doubt.  <u>See</u> <u>Mayberry</u>,

52 N.J. at 437 ("[I]n many situations circumstantial evidence may be 'more

forceful and more persuasive than direct evidence.'") (quoting <u>State v. Corby</u>,

28 N.J. 106, 119 (1958)); <u>State v. Rogers</u>, 19 N.J. 218, 234 (1955) ("So long as

the evidence is of sufficient quality to generate in the minds of the jurors a

belief and conviction of guilt beyond a reasonable doubt, it matters not

whether direct evidence of guilt is present.").

C.

Against that backdrop, we review the evidence presented by the State at

trial.[7]

---

[7] In its opinion denying defendant's motion for a judgment of acquittal, the trial court described defense counsel as "the best criminal defense attorney who has ever entered my courtroom," and stated that "on occasion after occasion, [defense counsel] convinced this Court to rule against the prosecution."  Indeed, the record reflects that defendant prevailed in almost every evidentiary dispute that arose at trial and that the trial court afforded defendant a full opportunity to impeach the credibility of the State's witnesses and present defendant's theories of third-party guilt.

1.

First, the State presented forensic evidence and other proofs regarding the skull, leg bones, sneakers, and remnants of clothing found at Raritan Center.

Through the testimony of law enforcement officers, the State established that a child's skull was found in the stream bed of Red Root Creek on April 23, 1992. The State offered fact testimony and the expert opinion of a forensic odontologist that the skull found in Red Root Creek was Timmy's skull. It also presented the testimony of law enforcement officers regarding the discovery of a child's leg bones in the same area, and evidence identifying those bones as Timmy's.

The State presented evidence that sneakers decorated with Ninja Turtle characters were found at the Raritan Center close to Red Root Creek, and that they were the sneakers that defendant bought for Timmy a week before he disappeared. It also presented evidence that two waistbands found in the stream were the remnants of clothing that had decomposed.

The State offered the testimony of fact and expert witnesses and photographic evidence regarding the topography of and tidal activity in the Raritan Center's Red Root Creek area. That evidence provided background to the State's proofs regarding the time frame in which Timmy's remains were

36

left at the Raritan Center, and the likely location of the deposit of those remains.

Contesting the opinion of a defense expert that Timmy's remains may have been moved by storm surge from the Raritan River to the Red Root Creek area, the State presented the testimony of an expert witness in civil engineering. The expert opined, based on the topography of the area and tidal activity, that Timmy's remains could not have been carried from the river by tidal influence to the location where they were found. The State also presented the testimony of an expert in forensic anthropology that the skull and bones had taken on the color of the soil in which they lay; that they had decomposed in the area where they were recovered; that bones not found at the site may have been moved by animal activity, water, or gravity; and that the condition of the skull and bones recovered was consistent with a "surface burial" of the child's body at the Raritan Center.

Viewed favorably to the State, and giving the State the benefit of all favorable inferences, the evidence supports a reasonable inference that one or more individuals killed Timmy and left his body in or near Red Root Creek at the Raritan Center.

2.

Second, the State offered evidence that Timmy's remains and the other items were found very close to defendant's former workplace, and that defendant was familiar with the area.

The State offered the testimony of two of defendant's former co-workers that defendant had worked at the office of Florida Fulfillment at the Raritan Center. It presented photographic and other documentary evidence and the testimony of investigating officers regarding the proximity of Florida Fulfillment's office to the location where the skull, bones, and other evidence were found.

The man who discovered the first sneaker on October 26, 1991, testified about the location where it was found, and a law enforcement officer told the jury that the location was four-tenths of a mile from the building that housed Florida Fulfillment's office at the Raritan Center. Defendant's manager at Florida Fulfillment testified that defendant would sometimes take walks around Raritan Center during her lunch break.

Viewed favorably to the State, the State's evidence regarding the proximity of Timmy's remains to the office of Florida Fulfillment supported a reasonable inference that defendant was present when her son's body was left in or near Red Root Creek, and that defendant chose a familiar location -- a

38

desolate wooded area very close to her former workplace -- to dispose of her son's remains.

3.

Third, the State presented evidence that the blanket found near Timmy's remains came from defendant's home.

As the State conceded, no blood, bodily fluid, hair, fibers, or other trace evidence was found on the blanket or other items that law enforcement recovered at Raritan Center. No DNA, hair, or other forensic evidence linked any of those items to defendant or defendant's home.[8]

To prove a connection between the blanket found at the Raritan Center and defendant, the State offered the testimony of four fact witnesses.

Crocco testified that Blair-Dilcher, Gerding, and Matthews, Timmy's former babysitters, recognized the blanket when he showed it to each of them in separate interviews after he reopened the case in 2011. He also identified several individuals who told him that they did not recognize the blanket found at Raritan Center. Five of those individuals -- defendant's father, defendant's sister-in-law, defendant's brother's former girlfriend, defendant's former

---

[8] The fact that the blanket was not photographed in the location in which it was found was thoroughly explored before the jury; indeed, a law enforcement officer testifying for the State conceded that the blanket was not handled in accordance with evidence protocols then in effect.

boyfriend, and defendant's former neighbor -- testified at trial that they did not recognize the blanket. The jury was thus aware that most of the witnesses to whom the blanket was shown stated that they did not recognize it, and it had the opportunity to assess the credibility of all of the witnesses who testified about the blanket.

Blair-Dilcher testified that she often babysat for Timmy during the final months of his life, and she would sometimes stay overnight in defendant's apartment to care for the child. Blair-Dilcher testified that although she did not recognize a jacket that Crocco showed her, she recognized the blanket as one she would use when she "would snuggle up with Timothy." Blair-Dilcher's credibility was impeached during extensive cross-examination: she was questioned about her history of drug use, her longstanding rift with defendant, whom she blamed for her loss of custody of her children, and comments she made to a defense investigator suggesting that she was uncertain about which of defendant's apartments she was in when she saw the blanket.

Gerding testified that she had lost touch with Blair-Dilcher after she moved to a different state at the age of sixteen and that the two had not spoken during the fifteen years that preceded defendant's trial. She stated that when she was thirteen years old, she had babysat for Timmy with Blair-Dilcher "once in a while" during a six-month period in 1990. Gerding testified that

40

she recognized the blanket found at Raritan Center as "[a] blanket that was in Michelle's home in the living room."

Matthews testified that she was unacquainted with Blair-Dilcher or Gerding and that she did not know who they were. She stated that she babysat for Timmy in 1988 and 1989, when defendant and Timmy were living in their first apartment in South Amboy. Matthews testified that she recognized the blanket retrieved in the search at Raritan Center, noting that "[i]t's like a light blue, it had like a metallic kind of threading in it. I used to see it because Timmy used to use it when he was, you know, a child when I used to babysit him." On cross-examination, Matthews stated that Timmy "would cuddle with [the blanket] at night before he went to bed," and that she did not babysit for Timmy after defendant and Timmy moved from her neighborhood in April 1990. On redirect examination, Matthews stated that the blanket's metallic thread was distinctive.

Viewing the evidence regarding the blanket favorably to the State, the evidence supports a reasonable inference that the blanket was deposited in the woods at Raritan Center with Timmy's remains, and that it came from defendant's home.

41

4.

Fourth, the State presented to the jury evidence of defendant's contradictory accounts of her son's disappearance at the carnival in Sayreville on May 25, 1991; evidence of defendant's conduct inconsistent with her statements that Timmy had been abducted; and evidence that defendant sought to avoid disclosing her prior employment at Raritan Center.

The jury heard evidence that defendant gave investigating officers six different accounts of her son's disappearance at the May 25, 1991 carnival.

Defendant's versions of the events contradicted one another with respect to what she and Timmy were doing when he was abducted. According to some of defendant's statements, she and Timmy were walking at the carnival when the abductors approached. In other statements, defendant claimed that when Timmy was abducted, she had just put him on a ride, was in line to buy a drink, or was returning to her car to get money.

Defendant's statements starkly diverged from one another with respect to the identity of Timmy's abductors. In defendant's initial statement to police, she said that she did not see the abductors who took her son and that Timmy vanished while she turned her back to buy a soda. In other statements, defendant said that the abductors were two men, one described as "older" and the other "younger." In later descriptions of Timmy's disappearance,

42

defendant said that the woman defendant identified as Ellen, accompanied by two men in their twenties or thirties and a small child, abducted Timmy. Defendant provided inconsistent descriptions of Ellen, her companions, and the knife that they wielded, as well as contradictory accounts of the abductors' threats to harm defendant or Timmy if defendant resisted them.

The State presented evidence that defendant admitted that some of her accounts of Timmy's abduction were untrue. Police officers testified that defendant told them that the version she had given them on June 7, 1991, not preceding accounts, was the accurate rendition of the events at the carnival. In that statement, defendant said that Ellen, a go-go dancer accompanied by two young white males and a two- or three-year-old girl, offered to watch Timmy while defendant bought a drink; when she returned they were gone.

The State presented evidence that, in the wake of Timmy's disappearance, defendant did not act as if she believed her son had just been abducted and might be found alive. Noting defendant's calm demeanor when she told them that Timmy was missing, Blair-Dilcher and Gerding testified that they -- not defendant -- initiated the search for Timmy and alerted an auxiliary officer. Law enforcement officers and other witnesses who spoke with defendant at the carnival testified that she said only that Timmy had

43

disappeared, and defendant's statements in the immediate aftermath of her child's disappearance are indeed devoid of any reference to an abduction.

Moreover, officers who interacted with defendant at the carnival described conduct suggesting that defendant did not view the search for her son to be a matter of urgency. A former Sayreville firefighter testified that he and another firefighter were assigned to drive defendant to her home to retrieve items belonging to Timmy to enable a canine search team to track the child's scent. After defendant collected the items at her home, she asked the officers to drive her to a bar in South Amboy, where her boyfriend worked, rather than directly returning to the search area to commence the canine search for her son. She remained inside the bar for ten to fifteen minutes, departing as the firefighters were about to enter the bar to find her. They then proceeded to the carnival site and gave the items to the canine search team.

Another officer testified that he had anticipated that defendant would be upset when he told her that the search for Timmy had been suspended for the night, but "[s]he basically said to me, okay, what time do you want me back."

Other evidence presented by the State indicated that although defendant said the man who threatened her said she might receive a call about Timmy or see him in "a month," she did not expect to be contacted by kidnappers holding her son. A neighbor who was in defendant's home the night Timmy

44

disappeared testified that although the answering machine on defendant's home was flashing, indicating that at least one voicemail message had been left on it, defendant did not check her messages; the neighbor did so instead. According to witnesses, defendant stayed with family and friends shortly after Timmy disappeared, and she later went on trips to Florida and the Bahamas while the search for her son was still underway.

The State also presented evidence that defendant left Florida Fulfillment off a list of previous employers that she provided law enforcement, and that Sayreville officers were unaware of her connection to Raritan Center until they were alerted by a former co-worker that she had worked there. Butkiewicz, the FBI agent, testified that he was similarly unaware that defendant had worked at Raritan Center when the first sneaker was found at that location. He stated that when he asked defendant for a list of former employers, she identified Florida Fulfillment as a "Florida-based company" and disclosed her former employer's Raritan Center location only when she was directly asked for the physical location where she had worked. A neighbor testified that when she asked defendant for directions to Raritan Center in order to attend a ceremony in Timmy's memory at the site where his remains had been found, defendant initially denied knowing how to get to Raritan Center but then provided detailed directions to her former workplace.

45

The jury also heard that when investigators showed defendant the first sneaker discovered at Raritan Center, she initially denied that it belonged to Timmy but later asked to view it again, after which she said that "it could be his sneaker."

Viewed favorably to the State, the evidence supports a reasonable inference that when defendant arrived at the carnival on the evening of May 25, 1991, she was aware that her son was already dead and that any search for him would be futile. The evidence further supports a reasonable inference that defendant gave law enforcement false and contradictory accounts of his abduction in order to deflect attention from her own culpability and impede the investigation of her son's disappearance.

5.

Fifth, the State presented evidence regarding Timmy's impact on defendant's financial situation and personal life.

Timmy's father, George Wiltsey, testified that he provided no financial contribution for Timmy's expenses or other assistance to defendant and that defendant had sole custody of her son.

The State called defendant's family members to testify about defendant's reliance on her relatives for assistance with child care. It presented evidence that defendant lost her primary source of support when her sister and brother-

46

in-law moved from New Jersey to Florida in January 1990. The State offered testimony that defendant was struggling to hold a job and care for her son because she had inadequate child care, that she had to bring Timmy to work on many occasions, that she changed jobs often, and that Timmy was frequently late for or absent from school.

The State also presented evidence that defendant's efforts to establish a stable romantic relationship were hindered by the presence of her child. Witnesses testified that defendant's inadequate child care limited her social life, that men whom defendant dated did not want to take on the responsibility of raising Timmy, and that Timmy had appeared to be jealous of the man whom defendant was dating in May 1991.

Viewed favorably to the State, this evidence supports a reasonable inference that defendant had a motive to kill her son.

6.

Sixth, the State presented the testimony of an expert on anatomical, clinical, and forensic pathology to prove that Timmy's death was a homicide, not the result of a disease, suicide, or an accident.

The expert explained to the jury her observations based on photographs from Timmy's autopsy and other evidence. She stated that children of Timmy's age sometimes die as a result of diseases such as meningitis, severe

tracheal laryngitis, and pneumonia, but that such deaths occur at hospitals or at home; she observed that "[y]ou do not find a child dying of natural causes being found in a creek" in a skeletonized state. The expert stated that suicide in a five-year-old is extremely rare, and that a young child's accidental hanging is sometimes mistaken for suicide. She opined that there was no evidence that Timmy died as a result of an accident.[9] Accordingly, the expert opined that although the cause of Timmy's death was undetermined, the manner of death was homicide.

Cross-examined about the basis for and scope of her opinion, the expert acknowledged the limitations of the evidence available to the State, and conceded that she reached her conclusion by process of elimination.

Viewed favorably to the State, expert testimony on anatomical, clinical, and forensic pathology supports a reasonable inference that Timmy died as the result of a homicide.

### D.

We next consider the evidence presented by defendant at trial.

---

[9] Relying on the testimony of fact witnesses that when Timmy suffered an accidental injury -- a dog bite that required stitches -- defendant promptly obtained medical attention for him, the State contended that defendant would have sought medical attention had Timmy been injured accidentally.

## 1.

First, defendant presented the testimony of defendant's family members and friends to show that she was a loving and attentive parent to Timmy. Witnesses for the defense testified that defendant worked to support Timmy and pay his tuition at St. Mary's School, that she did not punish him excessively or abuse him, and that she was shocked and distraught after his disappearance. Defendant's younger sons, born years after Timmy's death, testified that defendant displayed photographs of Timmy at their home and talked affectionately about him.

Viewed favorably to the prosecution, this evidence does not negate the State's evidence that defendant had a motive to kill Timmy. A reasonable jury could choose to disregard defendant's evidence about her relationship with her son and accept the State's evidence of motive.

## 2.

Second, defendant presented evidence that defendant was under significant emotional stress due to police interrogation when she gave her series of contradictory statements. She offered testimony of Sayreville police officers that local law enforcement were advised by the FBI about techniques for questioning her. Defendant called one of the investigating officers to testify that he learned that she was briefly hospitalized on June 13, 1991, after

being interrogated by the FBI and Sayreville police officers in turn; the officer stated that he had heard that she was suffering from a "mental breakdown" following police questioning.

The jury was free to draw an inference from defendant's evidence that she gave contradictory statements because of stress triggered by police interrogation, but a reasonable jury could reject such an inference and view defendant's divergent accounts of her son's disappearance as evidence of consciousness of guilt.

3.

Third, defendant presented witnesses who testified that they saw a child who could have been Timmy on May 25, 1991; their testimony thus corroborated defendant's account of the events of that day.

Defendant presented the testimony of a park ranger at Holmdel Park who stated that he saw a small boy, unaccompanied by an adult, playing with a basketball at the park that day.

Defendant called as witnesses three former employees of the company that operated the carnival in Sayreville on May 25, 1991. All had given statements to law enforcement after Timmy's disappearance that they saw a child fitting Timmy's description at the carnival.

50

The first of those employee witnesses stated that at 7:00 to 7:15 p.m. on May 25, 1991, he helped a young boy matching Timmy's description on and off a ride at the carnival. The witness conceded, after watching a video depicting him and a different little boy at the carnival, that he was uncertain that the child he saw was Timmy.

In a 1991 statement to police, a second former carnival worker had reported that she saw and spoke with a young boy who was called away by a young woman, and she later saw that young woman looking worried and concerned. At trial, however, the former carnival worker denied any recollection of those events.

A third former worker at the Sayreville carnival, eighty-five years old at the time of defendant's trial, recanted her May 26, 1991 statement to police and denied that she saw a child of Timmy's age at the carnival.

Defendant also offered the testimony of two sisters and their friend who, as teenagers, attended the carnival on May 25, 1991, and told police officers that they had seen a child at the carnival who may have been Timmy. The three witnesses testified that as they were leaving the carnival that evening, they saw a boy wearing Ninja Turtle sneakers running in the opposite direction. They testified that they saw a woman and two men walking behind the boy. Each of the three witnesses conceded that she could not be certain

51

that the boy whom she saw on May 25, 1991, was Timmy, or that the boy she saw running was with the three adults who walked behind him.

Viewed in the light most favorable to the prosecution, defendant's presentation of evidence that witnesses saw a boy who looked like Timmy on the day he disappeared does not negate the reasonable inference, supported by the State's evidence, that Timmy was not with defendant during the late afternoon and evening of May 25, 1991, and that he was not abducted at the carnival.

4.

Fourth, defendant presented evidence regarding the blanket found at Raritan Center.

Defendant called as witnesses several of defendant's family members, who stated that they did not recognize the blanket. She presented the testimony of the defense investigator who interviewed Blair-Dilcher and noted that Blair-Dilcher expressed uncertainty about which apartment she had been in when she saw the blanket.

Defendant also presented expert testimony regarding the blanket. Her expert on crime scene investigation and reconstruction testified that Butkiewicz violated evidence-collection protocols when he retrieved the blanket from the ground at Raritan Center without first photographing it in the

condition in which it was found, and did not retain the soil that had partially covered the blanket for later analysis. Defendant's expert on criminology and trace evidence testified that the blanket would be in far worse condition than it was had it been in the ground for eleven months between Timmy's disappearance in May 1991 and its discovery in April 1992. The expert also opined that, had the blanket been in contact with Timmy when he died, there would have been trace evidence found on it, even if the child was killed by smothering or strangulation.

Viewed favorably to the prosecution, defendant's fact and expert testimony regarding the blanket found at Raritan Center does not negate the reasonable inference, based on the State's evidence, that defendant took the blanket from her home with Timmy's body to the wooded area near Red Root Creek at Raritan Center.

5.

Fifth, defendant's crime-scene expert testified about the effect of water on the location of Timmy's body. The expert observed that ninety-four percent of the bones that comprised Timmy's skeleton were not found at Raritan Center and suggested that the skull and leg bones that were found may have been moved by tidal influence from the Raritan River to the location where they were found.

Defendant's expert testimony, viewed favorably to the prosecution, does not nullify the evidence presented by the State regarding the location and condition of Timmy's remains, or negate the reasonable inference from that evidence that Timmy's body was left in or near Red Root Creek at the Raritan Center.

6.

Sixth, defendant presented evidence supporting two theories of third-party guilt.

First, a defense witness testified that as he left the carnival during the evening of May 26, 1991, he saw two men leave an apartment complex with "probably about a four-foot object rolled up," that "looked like a sheet." The witness testified that the men threw the object into the trunk of a car and "sped off" in the car with the headlights off.

Second, defendant presented the testimony of Damien Dowdle, a resident of Tucson, Arizona. Dowdle testified that in late 1990, he and another Arizona man, Joseph McShane, committed robberies in Arizona, then traveled to Texas before separating. Dowdle stated that he and McShane were both arrested later that year, and briefly shared a prison cell in Arizona. According to Dowdle, McShane told him that after the two had split up in Texas, he had gone to the "East Coast area," stayed briefly with friends, and then proceeded

54

to a location that McShane called "Atlanta City," or an area near "Atlanta City," which Dowdle assumed was a town in Georgia. Dowdle testified that McShane told him that he went to "a park area" where a "big event" was going on and that he sexually assaulted and killed a boy who had run into the woods. Dowdle denied telling an Arizona police officer in 1991 that McShane had said that the child was murdered in Georgia; that the crime involved a mother, a daughter, a son, and a boyfriend; and that McShane had cut himself and stolen a car after the child's murder.[10]

Viewed in the light most favorable to the prosecution, defendant's evidence of third-party guilt could have been rejected by a reasonable jury, based upon the lack of any nexus between the object thrown into the trunk of a car and Timmy, Dowdle's credibility issues, and Dowdle's 1991 statement that the crime he alleged McShane committed took place in Georgia, not New Jersey.

---

[10] In its rebuttal case, the State called McShane as a witness. McShane denied murdering any child, stated that he had never been to New Jersey before, and identified friends in Georgia and Pennsylvania with whom he stayed after he left Texas. The State also presented the testimony of the Arizona police officer who had investigated Dowdle's claims about McShane. The officer stated that Dowdle told him in 1991 that McShane had admitted to killing a child in Georgia, prompting the officer to notify Georgia law enforcement. The officer testified that Dowdle said nothing to him about any alleged crime occurring in New Jersey and that there was no evidence linking McShane to the disappearance of any child. The officer also stated that when Dowdle made the claims about McShane, Dowdle was seeking a plea deal.

E.

We apply the <u>Reyes</u> standard to the extensive evidence presented to the jury in this exceptionally well-tried case. Viewing the evidence in its entirety, and giving the State the benefit of all its favorable evidence as well as all of the favorable inferences which reasonably could be drawn from that evidence, we consider whether a reasonable jury could find defendant guilty beyond a reasonable doubt of purposeful or knowing murder. <u>Reyes</u>, 50 N.J. at 458-59.

Giving the State the benefit of all favorable testimony and favorable inferences from that testimony, the State's evidence established that defendant was the last person seen with Timmy before he disappeared. It supports the conclusion that defendant left Timmy's body in the woods near her prior workplace at Raritan Center and that she knew when she went to the carnival during the early evening of May 25, 1991, that the child was already dead. If accepted by the jury, the State's expert's testimony supports the conclusion that Timmy died as the result of a homicide. A reasonable jury could draw a rational inference from that evidence that defendant caused the child's death.

Considered under the <u>Reyes</u> standard, the evidence was sufficient to establish beyond a reasonable doubt that defendant's conduct was "an antecedent but for which" Timmy's death would not have occurred, thus meeting N.J.S.A. 2C:2-3(a)(1)'s "but-for" causation requirement.

56

Viewed favorably to the prosecution and giving the State the benefit of all favorable inferences, defendant's contradictory and misleading statements to investigators, her apparent indifference to the urgency of searching for her son or awaiting word from his supposed abductors, and her "calm" demeanor in the wake of her son's reported abduction at knifepoint, all support a reasonable inference that she knew her son was dead and sought to divert police attention from herself. As we have held, "post-crime consciousness of guilt evidence can support a logical connection to a desired inference about mental state in specific and non-specific intent crimes." State v. Williams, 190 N.J. 114, 128 (2007); see also State v. Rechtschaffer, 70 N.J. 395, 413 (1976) ("Declarations subsequent to the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence or tend to establish intent are relevant and admissible.").

Viewed favorably to the prosecution, the trial testimony describing defendant's financial condition, the inadequate child care she had following the departure of her sister and brother-in-law from New Jersey, and the difficulty she encountered in maintaining romantic relationships because of her son, constitutes evidence of motive. As we have noted, "[c]ase law and treatises have recognized the special role of motive evidence and its unique capacity to provide a jury with an overarching narrative, permitting inferences

for why a defendant might have engaged in the alleged criminal conduct."

State v. Calleia, 206 N.J. 274, 293 (2011). Evidence of motive "can 'establish the identity of the defendant as the person who committed the offense.'" Ibid. (quoting 1 Wharton on Criminal Evidence § 4.45 at 479 (15th ed. 1997)). Here, the evidence supported a reasonable inference that defendant was struggling financially and in her personal life and that she thought that her son's death would alleviate the burdens that confronted her.

The evidence supports the jury's finding that the State met its burden to prove beyond a reasonable doubt the remaining elements of the offense: that defendant "purposely" or "knowingly" caused Timmy's death or serious bodily injury resulting in death, and that the child's death was either "within [defendant's] design or contemplation," or "involve[d] the same kind of injury or harm as that designed or contemplated and [was] not . . . too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on [defendant's] liability or on the gravity of [her] offense." N.J.S.A. 2C:2-3(b).[11]

---

[11] The lesser included offenses as to which the jury was charged -- first-degree aggravated manslaughter and second-degree reckless manslaughter -- do not require proof beyond a reasonable doubt of the element of purposeful or knowing conduct. See N.J.S.A. 2C:11-4(a)(1); -4(b)(1). N.J.S.A. 2C:2-3(c) prescribes the standard of causation for offenses requiring "that the defendant recklessly or criminally negligently cause a particular result." Because the

In short, we agree with the Appellate Division that when the State is afforded the benefit of all favorable testimony and the reasonable inferences that can be derived from that testimony, it presented sufficient evidence to prove beyond a reasonable doubt that defendant purposely or knowingly killed her son.[12] We concur with the Appellate Division's decision affirming the trial

jury convicted defendant of purposeful or knowing murder, it did not return a verdict as to the lesser included offenses.

[12] Our dissenting colleagues acknowledge the mandate of Reyes that when we review the evidence on a motion for a judgment of acquittal, we afford to the State the benefit of all favorable testimony and all favorable inferences which reasonably could be drawn from that testimony. Post at ___ (slip op. at 23) (citing Reyes, 50 N.J. at 458-59). Our colleagues assess the evidence, however, in precisely the opposite manner: they embrace defendant's theory of the case, reiterate defense counsel's attacks on the credibility of the State's witnesses at trial, and draw only inferences that favor the defense.

Our dissenting colleagues adopt, for example, the points addressed by defense counsel in his cross-examination of Blair-Dilcher at trial and conclude that the witness's identification of the blanket found at Raritan Center was not credible. Post at ___ (slip op. at 8-10). They dismiss as unpersuasive the expert testimony of Dr. Natarajan, whose qualifications to opine about the cause and manner of death were unchallenged at trial. Post at ___ (slip op. at 14-18). And they implausibly portray the State's evidence of motive as "a gender stereotype about single working mothers," as if the prosecution somehow sought to convict defendant on the basis that she was raising her child alone. Post at ___ (slip op. at 18-21). To the contrary, the State presented substantial evidence of defendant's state of mind, including her contradictory accounts of her son's disappearance and the placement of his body near her former workplace -- an aspect of her employment history as to which she was less than forthcoming.

The jury was entitled to believe or discredit the testimony of each and every witness who testified at trial, to draw or decline to draw inferences from the evidence, and to accept or reject the State's theory of the case. When the record is

court's denial of defendant's post-trial motion for a judgment of acquittal notwithstanding the verdict.

IV.

A.

We review for abuse of discretion the trial court's decision to dismiss Juror No. 1 and to substitute an alternate for the dismissed juror. State v. Musa, 222 N.J. 554, 564-65 (2015).

The trial court dismissed Juror No. 1 and substituted an alternate pursuant to Rule 1:8-2(d)(1), which provides in relevant part that,

> [i]f the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or is discharged by the court because of illness or other inability to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.

The Rule "and our case law delineate the circumstances in which juror substitution will not undermine the sanctity of the jury's deliberative process." State v. Jenkins, 182 N.J. 112, 124 (2004). When a trial court considers

---

viewed in accordance with Reyes, it is clear that the State presented sufficient evidence to sustain a reasonable jury's decision to convict.

whether the dismissal of a juror and the substitution of an alternate will impede full and fair deliberations, it conducts a two-step inquiry:

> First, the trial court must determine the cause of the juror's concern and assess the impact of the juror's departure on the deliberative process. Second, in light of the timing of the juror's dismissal and other relevant considerations, the trial court must ascertain whether a reconstituted jury will be in a position to conduct open-minded and fair deliberations.
>
> [State v. Ross, 218 N.J. 130, 147 (2014).]

When, as here, the court considers dismissing a juror for his or her "inability to continue" not caused by death or illness, it must first determine whether "the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members." State v. Valenzuela, 136 N.J. 458, 472-73 (1994). We "distinguish between reasons that are personal to the juror, which may permit a substitution under Rule 1:8-2(d)(1), and issues derived from 'the juror's interaction with the other jurors or with the case itself,' which may not." Ross, 218 N.J. at 147 (quoting State v. Williams, 171 N.J. 151, 163 (2002)). "[A]fter deliberations have begun, juror substitution 'should be invoked only as a last resort.'" Jenkins, 182 N.J. at 126 (quoting State v. Hightower, 146 N.J. 239, 254 (1996)).

In the second inquiry, the court considers whether, given the timing of the juror substitution, a reconstituted jury will be in a position to meaningfully

61

deliberate on the case. Ross, 218 N.J. at 149; see also Musa, 222 N.J. at 568. The court should consider factors such as "the timing of the juror's departure, his or her explanation of the problem prompting the inquiry, and any communications from the jury that may indicate whether deliberations have progressed to the point at which a reconstituted and properly charged jury will be unable to conduct open and mutual deliberations." Ross, 218 N.J. at 149.

In two appellate decisions, our courts have considered the effect of a juror's acquisition of information relevant to the case from sources outside of the courtroom.

In Hightower, a capital case, this Court addressed the dismissal of a juror who had overheard a conversation about the defendant while shopping and shared what he learned -- that the victim of the crime had three children -- with other jurors. Hightower, 146 N.J. at 248-50. The jury foreperson told the court that the juror had disclosed what he had learned about the victim's family in the context of "a fairly intense debate" in which the juror "was taking a different position than some of the other people," and "was almost lashing out." Id. at 249. The court learned that the jury deliberations had reached an advanced stage of the penalty phase: the jury had made tentative determinations on aggravating and mitigating factors, and the only inquiry yet

to be completed was "the jury's ultimate conclusion with respect to the sentence." Id. at 250.

The Court noted that "the juror did not follow the trial court's instructions to report to the court any information he overheard outside of the courtroom[] and violated his oath by informing other jurors that the victim had children." Id. at 255. It held, however, that the case did not meet Rule 1:8-2(d)'s inability-to-continue standard because the circumstances were not exclusively personal to the juror, given the relationship of his misconduct "to the case and to his interactions with the other jurors." Ibid. The Court found that "[b]ecause the stakes are so high in a death penalty trial, where serious juror misconduct occurs, prejudice will be presumed," id. at 266.

In State v. Holloway, the Appellate Division rejected the defendant's challenge to the trial court's dismissal of a juror. Following the jury's return of a verdict, the trial court learned that a relative of the juror had told her about a case involving the defendant's brother; the juror said that the revelation "helped me to decide but I had already made a decision." 288 N.J. Super. 390, 397-98 (App. Div. 1996). The juror conceded that she had told the other jurors that she "wouldn't be fair because, if they feel that I should say [the defendant is] guilty, because I don't feel that way"; she also admitted that she had had a conversation with friends "that helped convince me and . . . boost me up,"

63

adding, "it will be a waste of my time to stay in here." Id. at 401-02. The court concluded that the juror was unable to continue for purposes of Rule 1:8-2(d) "because she was not able to continue as a fair and impartial juror, not because she appeared to be 'pro-defendant.'" Id. at 404. It excused the juror, substituted an alternate, and instructed the reconstituted jury to begin anew. Id. at 402.

Noting that "[a] juror who has once disregarded the court's unambiguous admonitions" is likely to do so in deciding the case; that the discharge did not result "from any interaction in the jury room"; and that the timing of the juror substitution indicated that the reconstituted jury could fairly return a verdict, the Appellate Division affirmed the defendant's conviction. Id. at 404-05.[13]

## B.

We apply the two-part standard to the trial court's dismissal of a juror and substitution of an alternate in this appeal.

We concur with the Appellate Division that the trial court did not abuse its discretion when it determined that Juror No. 1 was unable to continue for reasons exclusively personal to him. See Lodzinski, ___ N.J. Super. at ___ (slip op. at 29-34). As did the Appellate Division, we view this case to be

---

[13] In Jenkins, the Court disapproved "that part of the holding in [Holloway] that allowed a substitute juror to join a jury that had announced its verdict to convict." 182 N.J. at 133 n.2 (discussing Holloway, 288 N.J. Super. at 405).

distinct from <u>Hightower</u>, in which the juror's misconduct was held to taint the entire jury in a capital case. See <u>Hightower</u>, 146 N.J. at 265. Here, the juror violated the court's clear and repeated direction not to conduct independent research, thus demonstrating his inability or unwillingness to comply with the court's instructions. As in <u>Holloway</u>, the juror acted independently of the other jurors; Juror No. 1 stated that he conducted the research on his own and that it produced very little information of interest to him.

Based on the court's detailed questioning of the other jurors, the jurors were either unaware of Juror No. 1's research or were aware of it but unaffected by it; indeed, at least one juror knew that the research was improper and reported it the court. Nothing in the record suggests that the opinion of a single juror was swayed by their fellow juror's improper conduct. The trial court properly instructed the jury to begin deliberations anew, consistent with the model charge. See <u>Ross</u>, 218 N.J. at 151; <u>Musa</u>, 222 N.J. at 561; <u>Model Jury Charges (Criminal)</u>, "Judge's Instructions When Alternate Juror Empaneled After Deliberations Have Begun" (rev. March 14, 2016).

We also agree with the Appellate Division that at the time of the juror substitution, the jury's deliberations had not proceeded too far for the reconstituted jury to conduct meaningful deliberations. On its first day of deliberations, the jury conferred for approximately three and a half hours; on

the second day of deliberations, it requested readbacks of certain witnesses' testimony, which the trial court provided, and deliberated for approximately an hour and a half. On the third day of deliberations, the court provided the jurors with additional readbacks that they had requested, and they deliberated for two or three hours before the court received the note alerting the court about the juror's research at 1:53 p.m. Although the record does not reveal the precise amount of time that the reconstituted jury deliberated before reaching its verdict, it evidently deliberated for part of the afternoon following the juror substitution and part of the following morning. Nothing in the record suggests the jury had reached a partial verdict or even preliminary determinations on any issue; all of the remaining jurors assured the court that they could fairly decide the case.

In short, we share the Appellate Division's view that the trial court properly exercised its discretion when it dismissed the juror, replaced him with an alternate rather than declaring a mistrial, instructed the reconstituted jury to begin deliberations anew, and denied defendant's post-trial motion under Rule 3:20-1 for a new trial.

State of New Jersey,

Plaintiff-Respondent,

v.

Michelle Lodzinski,

Defendant-Appellant.

JUSTICE ALBIN, dissenting.

Our system of criminal justice places great faith and trust in juries to decide the fate of their fellow citizens. It is not a blind faith or trust, however. Jurors are not infallible. All human deliberations, including jury deliberations, are subject to error. For that reason, checks and balances are built into our justice system to ensure the integrity of a jury verdict -- to ensure that an accused is not convicted of a charge that is not rationally based in the evidence. A court generally is not charged with policing the correctness of a verdict, which represents a jury's credibility determinations and factfindings; but a court has a commission to make certain that a verdict complies with the constitutional commands of due process. The court possesses a reservoir of power to dismiss a criminal charge or overturn a jury verdict when the evidence, viewed in the light most favorable to the State, cannot rationally

1

support the charge or verdict. <u>See</u> <u>R.</u> 3:18-1; <u>R.</u> 3:18-2; <u>see also</u> <u>R.</u> 3:20-1. It is a power that, although rarely invoked, guards against injustice. It is the system's fail-safe mechanism.

To be sure, the decision to exercise that power -- to take a case away from a jury or to overthrow its verdict -- is a difficult one, particularly in a murder case that has attracted sensational publicity. Nevertheless, a verdict cannot be upheld unless sustained by evidence grounded in the record. By that standard, the verdict in this case cannot stand.

The direct and inferential evidence -- viewed in the light most favorable to the State -- cannot rationally justify the murder conviction of Michelle Lodzinski. In the modern annals of New Jersey legal history, as recorded in the New Jersey Reports and the Superior Court Reports, to my knowledge, no murder conviction has ever been upheld on such a dearth of evidence.

There is no direct or inferential evidence of how Timothy Wiltsey died or the circumstances of his death. Even if the evidence suggests that Lodzinski had some knowledge or even involvement in Timothy's death, there is absolutely no evidence that she purposely or knowingly caused his death. There is no evidence to distinguish whether Timothy died by accident or by the negligent, reckless, or purposeful or knowing acts of a person -- even if that person were Lodzinski.

2

The evidence portrayed Lodzinski as a loving mother, not as an uncaring, abusive, or homicidal caretaker. Lodzinski, like many single parents, faced financial and social challenges. That not-unfamiliar scenario does not constitute a motive or proof that Lodzinski purposely or knowingly killed her son. A murder conviction cannot rest on speculation. A jury verdict sheet is not a dartboard.

The checks and balances in our criminal justice system have failed at all levels. The decades-long search for the cause of the tragic death of young Timothy has led only to a miscarriage of justice. Because the State failed to prove beyond a reasonable doubt that Lodzinski committed murder, I respectfully dissent.[1]

I.

A.

Sadly, the murder conviction in this case will stand despite the utter absence of proof that Michelle Lodzinski purposely or knowingly killed her young son. Due process requires that the State establish beyond a reasonable doubt every element of the offense, see In re Winship, 397 U.S. 358, 364

---

[1] I concur that the trial court did not abuse its discretion by dismissing the juror who improperly conducted outside research and that our state's legal standard for a judgment of acquittal -- as opposed to how that standard was applied in this case -- does not offend due process.

(1970), including the accused's state of mind, which is an essential element necessary to support a murder conviction, see N.J.S.A. 2C:11-3(a)(1) to (2). Neither the trial court, the Appellate Division, nor this Court's concurring opinion has explained satisfactorily how the jury rationally, rather than speculatively, arrived at its judgment. To better understand how this faulty verdict has been sustained -- and evaded the protection of our Court Rules and Constitution -- we must turn to a brief review of the overall evidence, and its shortcomings.

## B.

No one disputes that on the morning of Saturday, May 25, 1991, a neighbor saw five-year-old Timothy Wiltsey playing near his home where he lived with his mother, Michelle Lodzinski. By nearly all accounts, Lodzinski was a kind and caring young mother who worked multiple jobs, provided for her son, and sent him to private school. That evening, according to Lodzinski, she took Timothy to a carnival at Kennedy Park in Sayreville. At approximately 7:45 p.m., she reported that Timothy, dressed in a tank top, shorts, and Ninja Turtles sneakers, had disappeared.

Timothy's disappearance set off a frantic search, with Sayreville police officers and firefighters combing the surrounding area looking for the young boy. He was not found that evening or in the days that followed. The

4

prosecution would make much of Lodzinski's seeming lack of emotional affect in public after her child had gone missing. Others would speak of her anguish in private.

Lodzinski became the focus of an intensive police investigation into the disappearance of Timothy. Law enforcement officials searched her car at the scene twice and later searched her home, looking for some clue -- any forensic clue that might link Lodzinski to a crime against Timothy. Yet nothing was found.

Officials from various law enforcement organizations -- the Sayreville Police Department, the Middlesex County Prosecutor's Office, the New Jersey State Police, and the Federal Bureau of Investigation (FBI) -- would interview Lodzinski in the days, weeks, and months following Timothy's disappearance. In all, she was subjected to at least ten interrogations.

As the interviews continued and pressure mounted, she gave various conflicting accounts. After her initial narrative of events was not found satisfactory by investigating officers, she turned to another account and yet another version, as each was met with skepticism. Whether she altered her accounts in an effort merely to please her disbelieving interlocutors, or to

5

deceive them, was an issue for the jury.[2]

Lodzinski also became the focus of intense media scrutiny over the unsolved disappearance of her son. She expressed her frustration during an interview with two Sayreville police detectives by stating, "[g]o ahead and charge me if you think you could." During that interview, Lodzinski told a story of Timothy's abduction by two men, saying to the detectives, "you wanted to hear something, so I told you that" -- and abruptly walked out. Not long afterward, she told the detectives she had made up the story.

In an effort to break the case, the police continued to interrogate Lodzinski, even attempting to secure an admission in clandestine recordings. The Middlesex County Prosecutor's Office and the Sayreville Police Department coordinated with the FBI's Behavioral Science Unit to devise interrogation strategies for the purpose of extracting "a confession out of [Lodzinski]." In one instance, the County Prosecutor's Office sent a female investigator to interview Lodzinski at her home in an unsuccessful attempt to gather evidence and "possibly" admissions from her in a familiar environment.

---

[2] See Welsh S. White, False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions, 32 Harv. C.R.-C.L. L. Rev. 105, 124-25 (1997) ("A suspect who is eager to please and anxious to avoid conflict with an authority figure will want to accept an interrogator's view of the facts even if he disagrees with it.").

In another, the Sayreville Police enlisted Lodzinski's on-and-off boyfriend to secretly record her twice in an attempt to elicit incriminating information from her. One interrogation conducted by the State Police and the Sayreville Police lasted nearly twelve hours, from the time Lodzinski was picked up and dropped off at home. After that marathon interrogation session, Lodzinski checked herself into an emergency room for mental health counseling. The emotional strain of the investigation had apparently taken its toll. Although Lodzinski's accounts varied, she never admitted to having any involvement in Timothy's disappearance or death.

In October 1991, a man found a child's Ninja Turtles left sneaker in an area of Raritan Center in Edison -- a sneaker that matched the one purchased by Lodzinski for Timothy shortly before his disappearance. Six months later, in April 1992, investigators from the FBI, the State Police, the County Prosecutor's Office, and the Sayreville Police Department scoured that area of Raritan Center and discovered Timothy's remains -- in all, a skull and ten bones -- and nearby Timothy's Ninja Turtles right sneaker, a Ninja Turtles balloon, a pillowcase, and a partially buried blue blanket. The discovery occurred about four-tenths of a mile from a business in Raritan Center where Lodzinski had worked between 1988 and 1989.

Forensic testing of those items revealed no trace evidence linking Lodzinski to Timothy's death. Neither Lodzinski nor her parents recognized the blue blanket when it was shown to them. No one else was asked to view the blanket in 1992. In addition, the Medical Examiner issued a report that the cause of death was undetermined.

At that point, the investigation came to an end with no charges filed against Lodzinski.

C.

Over the next twenty years, Lodzinski moved on with her life, relocating to Florida and raising two sons. She kept Timothy's photograph in plain view in her home, reminding her sons they had a brother.

Then in 2011, Sergeant Scott Crocco of the Middlesex County Prosecutor's Office reopened the investigation into Timothy's death. He showed the blue blanket recovered at the burial scene to a number of persons familiar with the Lodzinski home. At that time, none recognized the blanket but one person -- Lodzinski's estranged niece, Jennifer Blair-Dilcher, who harbored a motive to avenge a wrong that she ascribed to her aunt.

When Blair-Dilcher was thirteen and fourteen years old, she babysat for Timothy and considered Lodzinski a trusted aunt. That trust persisted long after the investigation of her aunt in 1991. Indeed, sometime between 1998

8

and 2001, when Blair-Dilcher entered an in-patient drug rehabilitation program in Florida to treat her heroin addiction, she placed her two children in the care of Lodzinski. While Blair-Dilcher remained in that detox program, however, Lodzinski allowed the children to return to New Jersey -- to the home of Blair-Dilcher's mother-in-law, a woman Blair-Dilcher detested. Blair-Dilcher blamed Lodzinski for the temporary loss of custody of her children. From that point forward, Blair-Dilcher held an unabating animus toward her aunt.

In April 2010 -- just a year before Sergeant Crocco interviewed her and showed her the blue blanket -- Blair-Dilcher expressed her feelings about Lodzinski in a letter sent to her uncle. Blair-Dilcher wrote that Lodzinski had "ruined [her] life" by turning her children over to her mother-in-law and that "[she] will never forgive [Lodzinski]." In testimony, Blair-Dilcher admitted that she was "angry" at Lodzinski for "betray[ing]" her.

One year after Blair-Dilcher laid bare her feelings to her uncle, she was a willing collaborator with Sergeant Crocco, who enlisted her in an attempt "to elicit some sort of confession" from Lodzinski through a covert online-messaging scheme. That scheme to extract incriminating information failed. Nevertheless, nine days after Blair-Dilcher sent Lodzinski the first online message, she identified the blue blanket found at the burial scene as a blanket used by Timothy in Lodzinski's home. That revelation came a full twenty

9

years after babysitting Timothy.  During her testimony at trial, Blair-Dilcher admitted to giving differing accounts of -- and having some confusion about -- when and where she babysat Timothy, not a surprising fact given the frailty of human memory.

Blair-Dilcher's identification of the blue blanket -- despite the inability of others to recognize it -- was a critical turning point in the renewed investigation.  If believed, it seemingly debunked Lodzinski's various accounts that Timothy disappeared at the carnival and suggested that Timothy was buried with the blue blanket from Lodzinski's home.

At the time a Middlesex County Grand Jury returned the indictment charging Lodzinski with murder in 2014, the only significant additional evidence in the case from the 1991-1992 investigation was the identification of the blue blanket.

D.

At Lodzinski's trial, which began in January 2016, the blue blanket became one of the central threads of the State's case.  Of the many people familiar with Lodzinski's residence in 1990 and 1991, only two, beside Blair-Dilcher, professed to recognize the blue blanket:  Danielle Gerding and Dawn Matthews.

When Gerding was fourteen years old, between 1990 and 1991, she babysat Timothy "once in a while" along with her good friend Blair-Dilcher. Sergeant Crocco and another investigator interviewed Gerding in 2011 but did not show her the blue blanket then. During that interview, Gerding described the contents of Lodzinski's apartment and recalled only one blanket -- a blanket with animated characters on it.

Not until October 2015, just three months before the start of trial -- after the return of the indictment and amidst the pretrial publicity surrounding the case -- Sergeant Crocco for the first time showed Gerding the blue blanket, which she positively identified as present in Lodzinski's apartment in 1990 and 1991.[3] She did not recall that blanket four years earlier during her

---

[3] News coverage abounded about the Lodzinski case and Blair-Dilcher's identification of the blanket in the weeks and months before Gerding and Matthews made their identifications. See, e.g., Mark Mueller & Susan K. Livio, Lodzinski Murder Trial to Proceed, Court Rules, Star-Ledger, Sept. 24, 2015, at 15 ("The judge appeared to give credence to the state's key piece of evidence: a blue-and-white blanket discovered near Timothy's remains. Lodzinski's niece, Jennifer Blair, identified the blanket as Timothy's when investigators brought it to her in 2011 . . . ."); Suzanne Russell, State: Timothy Wiltsey's Death Was No Accident, mycentraljersey (Sept. 23, 2015), https://www.mycentraljersey.com/story/news/local/middlesex-county/2015/09/23/wiltsey-fbi-file-has-no-impact-lodzinski-motions/72616764 (reporting that the trial court denied Lodzinski's motion to dismiss the indictment and that Blair-Dilcher "positively identified that blanket as coming from defendant's home"); Trial Date Set for Woman Accused of Killing Son in Decades-Old New Jersey Cold Case, CBSNewYork (Aug. 20, 2015), https://newyork.cbslocal.com/2015/08/20/michelle-lodzinski-trial-date-set

11

interview with Crocco.  Her identification of the blanket occurred more than twenty-four years after she had babysat for Timothy.

Dawn Matthews babysat for Timothy between 1988 and 1990 when she was between the ages of fifteen and seventeen.  A little more than two weeks before the start of the trial, Sergeant Crocco showed Matthews the blue blanket.  Matthews positively identified the blanket as the one she saw in Lodzinski's apartment twenty-five years earlier.  She admitted that at the time she identified the blanket she knew that Lodzinski had been charged with murder and was awaiting trial "because it was on TV, and . . . in the newspaper and whatnot."

Of the twelve people shown the blanket, only three made an identification.  After he reopened the investigation, Sergeant Crocco exhibited the blanket to Renee Buckley, Lodzinski's sister-in-law; Danielle Marquis, Lodzinski's brother's ex-girlfriend; Ed Lodzinski, Jr., Lodzinski's brother; Michael Lodzinski, Lodzinski's brother; Cheryl Kassay, Lodzinski's friend; Theresa McConnell, Lodzinski's landlord and neighbor; and Andrew Mianulli, Lodzinski's former fiancé.

---

(reporting that the State's evidence against Lodzinski included "a blanket found near Timothy's body," which a "key witness immediately recognized").

12

None recognized the blanket. Neither did Lodzinski's parents when shown the blanket in 1992.

Additionally, multiple witnesses testified that they recalled other blankets in Lodzinski's various apartments in South Amboy. One photograph from Lodzinski's residence showed "a pink and blue and white blanket" that Timothy used as an infant. Another photograph showed a "blue, purple, [and] white" crocheted blanket that belonged to Lodzinski. Neither of those blankets was the blanket discovered at the burial site. The blanket identified by Blair-Dilcher, Gerding, and Matthews does not appear in any of the photographs taken of Lodzinski's home circa 1991.

The potential for confusion was inevitable given that the Middlesex County Prosecutor's Office did not display the blanket to anyone except Lodzinski and her parents after its discovery in 1992. That the County Prosecutor's Office waited twenty to twenty-five years to ask witnesses to identify a critical piece of evidence -- a blanket, a rather mundane household item -- necessarily raises reasonable questions about the reliability of the identifications.

Significantly, no biological or other forensic evidence tied the blanket to Lodzinski or her home.

E.

Even crediting the testimony of Blair-Dilcher, Gerding, and Matthews over those who did not recognize the blanket and dismissing Lodzinski's denials, and even accepting that Lodzinski had some knowledge or involvement in Timothy's burial given the location of his remains, the State offered no evidence from which a rational jury could conclude that Lodzinski purposely or knowingly caused Timothy's death.

The testimony of the prosecution's key medical expert, Dr. Geetha Natarajan, the retired Chief Medical Examiner of Middlesex County, did not give the jury license to conclude that Lodzinski murdered her son.

Dr. Natarajan did not perform the autopsy in this case or ever examine Timothy's remains. That was done by Dr. Marvin Shuster, the Chief Medical Examiner in 1992, who had died before the case came to trial. Instead, Dr. Natarajan -- retained as a consultant -- relied on Dr. Shuster's autopsy report and photographs as well as reports by other experts in radiology, odontology, and anthropology to arrive at an opinion on the cause and manner of Timothy's death.

Dr. Natarajan, like Dr. Shuster, concluded that the cause of Timothy's death was "undetermined." She came to that conclusion because only eleven of Timothy's bones were recovered. Missing were "the ribs and the

14

vertebrae," and no organs or tissue remained.  Although none of the few bones recovered showed any evidence of injury or fracture, she could not determine that "the entire skeleton [was] devoid of any injury."  In other words, there was no way of discerning whether any missing part of the skeleton would have revealed an injury or fracture.  She conceded that she was unable to explain "when," "where," or "how" Timothy died.

Nevertheless, Dr. Natarajan opined that the manner of his death was "homicide."  She reached that conclusion by a "preponderance of evidence" -- without ever observing any actual evidence of homicide, such as evidence of a knife or gunshot wound, strangulation, physical abuse, poisoning, or some other tangible sign indicating the manner of death.  Rather, Dr. Natarajan arrived at her determination through the process of elimination, ruling out natural death, suicide, and accident.  For Dr. Natarajan, that process of elimination stemmed primarily from the fact that Timothy's "body was found in a creek, and remained there for [a] considerable period of time," and therefore his death would "have to be an unnatural death, particularly homicide."

That is not an ineluctable deduction, however; it does not follow from the laws of science or medicine in which Dr. Natarajan clothed her opinion.  Dr. Natarajan openly acknowledged that she did not know "how" or "where"

15

Timothy died. She stated that "there is nothing that is pointing towards any kind of accident"; yet nothing pointed medically in some other direction given the absence of most of the bones from Timothy's body. Timothy could have died in some accidental scenario (the how) in some unknown place (the where) and then been transported to Raritan Center where he was buried among the items he loved. Of course, that is utter speculation -- but no more so than Dr. Natarajan's wholesale elimination of accident as a manner of death based primarily on the location of the body.

But even if we were to accept Dr. Natarajan's conclusion that the manner of death was "homicide" and not accident, she never opined on what particular type of homicide caused Timothy's death -- nor could she without entering into the realm of conjecture. The criminal law recognizes various degrees of homicide: negligent, reckless, purposeful or knowing, and strict liability vehicular homicide.[4]

The New Jersey Code of Criminal Justice provides that "[a] person is guilty of criminal homicide if he purposely, knowingly, recklessly or, under the circumstances set forth in N.J.S.A. 2C:11-5 or [N.J.S.A. 2C:11-5.3], causes

_____

[4] Although New Jersey does not recognize the crime of negligent homicide, other states do. See, e.g., N.Y. Penal Law § 125.10 (McKinney) ("A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person.").

16

the death of another human being." N.J.S.A. 2C:11-2(a). Under the Code, "[c]riminal homicide is murder, manslaughter or death by auto or vessel." N.J.S.A. 2C:11-2(b). To prove that a defendant committed one of those crimes as opposed to another, the State must prove beyond a reasonable doubt that the defendant possessed the requisite mental state to commit the crime. See N.J.S.A. 2C:2-2(a) to (b); State v. Sexton, 160 N.J. 93, 98-99 (1999).

To prove murder, the State must establish that the defendant "purposely" or "knowingly" "cause[d] death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3(a)(1) to (2) (emphases added). To prove manslaughter or aggravated manslaughter, the State must establish that the defendant "recklessly" caused death, N.J.S.A. 2C:11-4(b)(1) (emphasis added), or "recklessly cause[d] death under circumstances manifesting extreme indifference to human life," N.J.S.A. 2C:11-4(a)(1) (emphasis added). Moreover, a person is guilty of strict liability vehicular homicide when she causes death "by driving a vehicle while intoxicated in violation of [N.J.S.A.] 39:4-50." N.J.S.A. 2C:11-5.3(a).

The point is that Dr. Natarajan concluded only that the manner of death was homicide; she never ventured a medical or scientific opinion that a person purposely or knowingly caused Timothy's death. To do so would have constituted sheer speculation.

17

But in her summation, that is precisely what the prosecutor asked the jury to do -- speculate about the cause and manner of Timothy's death. In summation, the prosecution seemingly equated Dr. Natarajan's opinion that the manner of death was homicide with purposeful or knowing murder. The prosecutor did tell the jury that the difference between the murder and manslaughter charges was intent. But the prosecutor did not and could not know whether Lodzinski engaged in purposeful or knowing conduct. Without evidence to fill the void, the prosecutor suggested that Lodzinski's "disposing of [Timothy's] body in a ditch was [the] purposeful act" necessary to prove murder. Certainly, disposing of a body is a purposeful act, but that is different from purposely causing death.

To establish that Lodzinski purposefully caused the death of her son, the prosecutor also asked the jury to infer a motive to kill from Lodzinski's social and financial circumstances -- the stereotypical circumstances facing many single parents raising a child.

F.

The prosecution's only evidence of motive to prove that Lodzinski intended to kill her son was built on a gender stereotype about single working mothers. In summation, the prosecutor urged the jury to find that Lodzinski purposely or knowingly killed Timothy because "Lodzinski was a young

18

struggling mother"; because her boyfriends were not "willing to care for someone else's child" and therefore were not going to marry her; because Timothy had become a "burden on her"; and because -- as the prosecutor surmised -- "[Lodzinski] had had enough." But that theorizing was based not only on a generalized and unfounded trope about single working mothers, but was also belied by the real relationship between Lodzinski and her son as detailed during the trial.

By nearly all accounts, Lodzinski was a loving mother who worked tirelessly to care for and support Timothy. She saved money to send him to Catholic school; helped him with his homework; bought him new clothes decorated with his favorite cartoons; took him camping and to parks and birthday parties; sent him to the dentist; and brought him to the hospital when he was injured. She also secured childcare from friends and family to watch Timothy while she was away. Lodzinski's landlord and neighbor testified that she did not notice any unusual tension or stress in Lodzinski's life in the days leading up to Timothy's disappearance, including on the night before he went missing.

Against that backdrop, what proof did the prosecutor offer that Lodzinski resented Timothy to the point that she had a motive to purposely kill him? That she raised Timothy as a single mother without child support from

19

his father; that she brought Timothy to her workplace when she could not find daycare; that she changed jobs with some frequency and was often late to work; that she forgot to call the babysitter a "handful of times" when she could not make it home; that Timothy was often late or absent from school; that she struggled financially as his sole caregiver; and that she was "unable to find a steady, satisfying relationship." From those circumstances, the prosecutor urged the jury to believe that Lodzinski murdered her son because he was a "social burden."

Although single-parent child-rearing is exceedingly common, societal stereotypes about single parents, particularly single mothers, persist. See, e.g., Nancy E. Dowd, Stigmatizing Single Parents, 18 Harv. Women's L.J. 19, 20, 49 (1995) ("Both socially and legally, we relentlessly stigmatize single parents as bad parents who have broken, incomplete, dysfunctional families which result in predictably disastrous consequences for their children" -- a stigma that is "primarily directed at single mothers."). This Court has rejected invidious class assumptions to establish a general motive to commit a crime. For example, we have held that the State cannot offer a defendant's financial distress as a general basis for concluding he had a motive to rob. See State v. Mathis, 47 N.J. 455, 471-72 (1966) ("[T]here must be something more than poverty to tie a defendant into a criminal milieu.").

20

The "burdens" that the State says motivated Lodzinski to kill are the same financial and social challenges facing many single working parents -- the struggle to stay in a job, to find daycare, and to maintain a relationship. They do not establish a motive to commit murder.[5]

## II.

## A.

A jury trial -- one of our most valued and vaunted rights -- is not a guarantee that perfect justice will be rendered by a verdict. Inherent in any factfinding or a trial is a "margin of error" that must be taken into account. See Winship, 397 U.S. at 364. The safeguards in our system of justice are intended to minimize that margin of error, particularly in a criminal case where a wrongful conviction will lead to the deprivation of a person's liberty. Id. at 363-64. Due process requires that the State prove beyond a reasonable doubt an accused's guilt. Id. at 364. That high standard of proof reduces the

---

[5] The prosecutor also relied on gender stereotypes about female emotions to argue that Lodzinski did not display the proper affect of a mother after Timothy's disappearance, stating in summation, "Michelle Lodzinski acted wholly inconsistent with how a mother who lost her child would act": "She is not emotional, because her son is missing. She's not panicked. She's not running around looking for him. She's calm in the face of her son being missing for minutes, hours, and then days." That stereotype, of course, ignores the reality that people exhibit emotional shock and grief differently. See Kenneth J. Doka & Terry L. Martin, Grieving Beyond Gender 4 (2010).

potential for error and makes less likely that an innocent person will be wrongly condemned and imprisoned.  Id. at 363-64.

The courts -- as guardians of our Federal and State Constitutions -- are charged with ensuring that the beyond-a-reasonable-doubt standard is not just a watchword but that it remains a vital bulwark protecting the rights of the accused.  Our Court Rules place on our trial and appellate judges the solemn responsibility of determining when the evidence presented at trial is so inadequate that a verdict of guilty cannot be sustained.  It is not an easy task for a single jurist to overturn a verdict rendered by twelve jurors, nor should it be; but it is an inescapable duty when there is no rational basis to support a finding of guilty.

Rule 3:18-1 provides that a court must enter a judgment of acquittal if after the close of the State's case or after the submission of all evidence by the State and the defendant "the evidence is insufficient to warrant a conviction." Rule 3:18-2 adds another layer of procedural protection by authorizing a court, even after the entry of a verdict of guilty, to enter a judgment of acquittal because of insufficiency of evidence.  Those rules ensure that there is no weakening of the beyond-a-reasonable-doubt standard, even if the jury is swayed to render a guilty verdict in the absence of sufficient evidence.

Our courts are cautioned not to enter a judgment of acquittal, pre- or post-verdict, unless after viewing the direct and circumstantial evidence in its entirety and after giving the State the benefit of all the favorable testimony and inferences to be drawn from the evidence, no "reasonable jury could find guilt of the charge beyond a reasonable doubt." See State v. Reyes, 50 N.J. 454, 458-59 (1967). A court's overturning a jury verdict and entering a judgment of acquittal for insufficiency of evidence is a remedy not often invoked. Yet, as the United States Supreme Court has recognized, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 317 (1979). Under Winship, "when such a conviction occurs in a state trial, it cannot constitutionally stand." Id. at 317-18. It is the judge's role to make certain that a verdict does not rest on "conjecture" or "pure speculation" or "passion, prejudice or sympathy." See Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947).

We must also be mindful that "the State's right to the benefit of reasonable inferences should not be used to shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." State v. Brown, 80 N.J. 587, 592 (1979) (citing Cnty. Ct. of Ulster Cnty. v. Allen, 442

23

U.S. 140, 156 (1979)).  Undoubtedly, the Reyes standard is a high hurdle to clear, but when it is cleared, a trial or appellate judge has a duty to set aside a jury verdict.

B.

Missing in this case is direct or inferential evidence to prove an essential element of the offense of murder -- that Lodzinski purposely or knowingly caused Timothy's death.  Conjecture, disguised as reasonable inferences, is not the equivalent of evidence; and bootstrapped inferences were insufficient to establish Lodzinski's state of mind.  See Brown, 80 N.J. at 592.

The concurrence's broadside against the dissent -- as somehow taking sides and weighing credibility -- will not obscure or deflect from the record. The Reyes standard does not require this Court to disregard inconvenient or messy facts.  More than two decades after Timothy's disappearance, three witnesses identified a blanket purportedly from Lodzinski's household.  The circumstances surrounding the identification of the blanket by those witnesses -- one who had an undisguised animus toward Lodzinski, and two others who were shown the blanket on the eve of trial amidst saturated negative press coverage -- are undisputed facts.  Those circumstances are recounted because bootstrapped inferences are drawn from those identifications about Lodzinski's state of mind.

24

To fill the void of evidence and lighten the burden of proof concerning Lodzinski's state of mind, the prosecution and now the concurrence rely on other strained inferences. That Lodzinski had a motive to murder her child, as the prosecutor argued, because she was navigating life as a single working mother under challenging financial and social circumstances, is not grounded in the evidence but on unfounded tropes and stereotypes that apply with equal force to millions of other parents.

Moreover, Lodzinski's conflicting accounts to the police are not evidence of murder. She knew that her account of Timothy's disappearance met with disbelief from law enforcement, so she gave other accounts. Despite those conflicting accounts, the investigation was closed in 1992.

Last, Dr. Natarajan's testimony offers no assistance in proving the essential element of state of mind. Dr. Natarajan eliminated accident by a preponderance of the evidence -- not through any forensic medical discovery. In concluding homicide as the manner of death, Dr. Natarajan did not distinguish -- or even try to distinguish -- between negligent, reckless, or purposeful or knowing homicide. In the end, the evidence does not establish whether Timothy died from an accident or by a negligent, reckless, or purposeful act.

C.

The sustaining of the murder conviction in this case on such a paucity of evidence has no parallel in this state, to my knowledge.  The concurrence does not cite to any case even remotely similar where such a verdict has been upheld.  Even the Appellate Division distinguished the murder conviction in State v. Zarinsky, 143 N.J. Super. 35 (App. Div. 1976), aff'd, 75 N.J. 101 (1977) -- a case arguably near the outer limits of a sustainable verdict -- from the conviction in this case.  See State v. Lodzinski, ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 14-15).

In Zarinsky, the victim's body was never found but the State presented extensive direct and circumstantial evidence that the defendant caused her death:  the defendant was identified as attempting to lure young girls into his car; the victim was last seen riding in the defendant's car; panties and hairclips similar to those worn by the victim were found in the defendant's car; blood was discovered on its rear bumper and taillight; and the defendant told jail inmates that he had tossed the victim's body into a river.  143 N.J. Super. at 41-47.  The Appellate Division in this case acknowledged that not even Zarinsky was comparable, stating that "[t]he contrast between such evidence of the defendant's conduct in Zarinsky, and what the State adduced here, requires no further comment."  Lodzinski, ___ N.J. Super. at ___ (slip op. at 15).

26

No direct or circumstantial evidence in this case established the cause or manner of Timothy's death. No trace evidence -- not a fiber, a hair, or DNA -- tied Lodzinski to the crime of murder. The limited number of bones recovered from Timothy's body revealed no fracture or injury. No witnesses came forward that Lodzinski ever harmed her child. No confession was forthcoming from Lodzinski, despite repeated interrogations and secret recordings of her conversations.

Even if one were to concede, based on the identification of the blanket and the location of Timothy's remains, that Lodzinski had some involvement in Timothy's burial or even his death, the prosecution offered no direct or inferential evidence that Lodzinski purposely or knowingly caused Timothy's death -- an essential element of the crime of murder. The prosecutor in summation could not and the concurrence does not explain how a jury could rationally choose between reckless manslaughter or purposeful or knowing murder.

The due process requirements of both our Federal and State Constitutions mandate that our courts vacate a conviction that rests on "conjecture" or "pure speculation," see Curley, 160 F.2d at 232 -- a conviction based on evidence from which "no rational trier of fact could find guilt beyond a reasonable doubt," Jackson, 443 U.S. at 317. See also State v. Medina, 147

27

N.J. 43, 49-50 (1996).  Under <u>Winship</u> and the commands of due process, Lodzinski's <u>murder</u> conviction cannot stand.  <u>See</u> <u>Jackson</u>, 443 U.S. at 317-18. But it will, at least for now, because the three dissenting votes in this appeal are insufficient to prevent this miscarriage of justice.

I therefore respectfully dissent.